**CIRRUS HOLDING COMPANY LIMITED, a Cayman Island Company, Plaintiff,**

v.

**CIRRUS INDUSTRIES, INC., a Delaware Corporation, and Aeroglobal Capital Management, LLC, a Delaware Limited Liability Company, Defendants.**

**C.A. No. 18978.**

Court of Chancery of Delaware, New Castle County.

Submitted: July 17, 2001.
Decided: July 19, 2001.

William O. LaMotte, III, William M. Lafferty, Jessica Zeldin, Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware; and Michael R. Smith, (argued), Dan S. McDevitt, John P. Brumbaugh, King & Spalding, Atlanta, Georgia, for Plaintiff, Cirrus Holding Company Limited.

David C. McBride, Bruce L. Silverstein, Danielle Gibbs, Young, Conaway, Stargatt & Taylor, Wilmington, Delaware; and Peter W. Carter, David Y. Trevor, (argued), Christopher Shaheen, Dorsey & Whitney, Minneapolis, MN, for Defendant, Cirrus Industries, Inc.

Lewis H. Lazarus, Michael A. Weidinger, Elizabeth A. Brown, Morris, James, Hitchens & Williams, Wilmington, Delaware; and Timothy C. Russell, (argued), Michael C. Wagner, Joseph J. Hamill, Jr., Spector, Gadon & Rosen, Philadelphia, Pennsylvania, for Defendant, AeroGlobal Capital Management LLC.

### MEMORANDUM OPINION

LAMB, Vice Chancellor.

### I. INTRODUCTION

This case involves a proposed issuance to a new investor of a majority block of stock in a Delaware corporation that, al-

though it is not a public corporation, does not now have a majority stockholder. That transaction is embodied in a stock purchase agreement that requires a stockholder vote for its approval. That contract includes a form of "fiduciary out" that purports to regulate by contract the exercise of the directors' fiduciary duties in relation to competing proposals received by the corporation. It also includes a provision for the payment of a substantial "termination fee" and unusually stringent provisions making receipt of that fee exclusive of other legal or equitable remedies.

This action is brought by the purchaser in response to the corporation's decision to terminate the agreement and accept another proposal, not involving a change of control, that the directors concluded was a more attractive proposition. The possibility of that other proposal was known to the purchaser at the time it signed the stock purchase agreement. The purchaser now seeks a preliminary injunction barring the corporation from presenting the other proposal to its stockholders for their vote. Ultimately, following a trial on the merits, the purchaser will ask the court for a decree of specific performance, requiring the corporation to submit its proposal to the stockholders for a vote.

In large measure, the purchaser's claim turns on its narrow and technical reading of the "fiduciary out" provisions of the agreement. It contends that because the directors of the corporation did not follow in detail the narrowly drafted procedures prescribed therein, their ultimate decision to approve the competing proposal was a product of a breach of contract and must not be given effect. Although my decision on the matter turns largely on another consideration, the arguments made here about the "fiduciary out" provisions of the

contract are an object lesson in the substantial tension that can exist between a director's discharge of his or her fiduciary duties and the need to comply with overly intricate contract language often written for the purpose of impeding or, at least, regimenting, the performance of those duties in complex and dynamic situations.

For the reasons discussed in this opinion, I conclude that the plaintiff purchaser has not earned its injunction because it has not established a reasonable likelihood of success on its action for specific performance.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Parties

Plaintiff Cirrus Holding Company, Ltd. is a Cayman Islands company formed on April 21, 2001 for the express purpose of facilitating an investment in defendant Cirrus Industries, Inc. ("Cirrus" or the "company") by First Islamic Investment Bank E.C. ("FIIB"), an international investment bank headquartered in Bahrain. FIIB has been represented throughout this transaction by Crescent Capital Investments, Inc. ("Crescent"), a U.S.-based subsidiary of FIIB which serves as an advisor to FIIB on certain U.S. private equity investments.

Defendant Cirrus is a privately-held Delaware corporation based in Duluth, Minnesota, founded in 1984 by two brothers, Alan and Dale Klapmeier, and is a manufacturer of small single-engine piston general aviation aircraft. Cirrus's Board has ten members: Alan Klapmeier (President, CEO, and Chairman of the Board), Dale Klapmeier (Cirrus's Chief Operations Officer), Larry Klapmeier,[1] Marwan Atalla, James Brown, Dr. Dennis Elbert, Alice

---

1. Collectively Alan and Dale Klapmeier own 30 percent of the outstanding Cirrus common stock. Larry Klapmeier is Alan and Dale Klapmeier's father.

Hitchcock, Bill Midon, James Taylor, and William Woods.

Defendant AeroGlobal Capital Management, LLC ("AeroGlobal") is a Delaware limited liability company created on April 30, 2001. The members of AeroGlobal are Craig Millard, GH Ventures, LLC, and Boundary Waters Holding LLC. Millard was former chairman and sole stockholder of Prudential Preferred Properties. GH Venture Partners is a New York-based boutique merchant banking firm, whose principals are Christopher Moe and Ralph Isham. Boundary Waters Holding is the vehicle through which Keith Fitzgerald does business with AeroGlobal. Moreover, Fitzgerald has been involved in fundraising for Cirrus in the past and is a personal friend of Alan and Dale Klapmeier, Hitchcock, and Cirrus's outside counsel, Jeff Hesson.

### B. Cirrus's Financial Situation

Even though Cirrus is purportedly "years ahead of its competitors in developing cutting-edge, FAA-certified single-engine aircraft," the company has had serious financial problems resulting from its inability to meet demand and to cover expenses. Because of the capital-intensive nature of the industry, Cirrus "has been in a near constant state of fundraising, either through equity offerings or other financings." In order to raise capital and to introduce Cirrus to potential investors, Cirrus engaged several different placement agents, including Pedersen Kammert & Co. LLC. Cirrus, however, disputes that it has canvassed the market for a change in control transaction.

### C. The Cirrus–Crescent Relationship

Early this year, Cirrus came to the attention of Crescent's representative, John Dyslin. Dyslin shared with Alan Klapmeier Crescent's interest in Cirrus and visited the corporate headquarters and product facilities in Duluth, Minnesota. After visiting Cirrus's operations, Dyslin recognized Cirrus's potential as an investment opportunity for Crescent, believing that its production efficiency could be greatly improved with the assistance of manufacturing process consultants. Dyslin began negotiations with Alan Klapmeier in March 2001.

Cirrus continued its ongoing search for capital. On April 19, 2001, Fitzgerald approached Millard about investing in Cirrus, and Millard, greatly interested by the opportunity, quickly extended to Cirrus a bridge loan on April 20 of $500,000, convertible into common stock. He also expressed an interest in making a much larger investment in Cirrus.

### D. Crescent's Letter of Intent and AeroGlobal's Interest

On April 24, plaintiff Cirrus Holding and Cirrus executed a non-binding letter of intent (LOI) memorializing the negotiations between the two companies. Plaintiff agreed to invest $77.5 million cash for a total of 61 percent of Cirrus's outstanding shares on a fully-diluted basis ($68.9 million directly to Cirrus for 54.2 percent of the outstanding shares and $8.6 million to Cirrus's shareholders for an additional 6.8 percent). Furthermore, the LOI provided that Cirrus's seven series of preferred stock be converted into common stock so that all equity holders in Cirrus would hold the same security, Cirrus common stock, at the conclusion and no debt or classes of stock would be senior to the Cirrus common stock.[2] If no agreement

---

**2.** Evidently, this term of the proposed transaction was designed to meet certain requirements of Islamic law that govern the com-

were reached by May 21, 2001, the LOI was terminable by either party. The LOI contained both confidentiality provisions and prohibitions against Cirrus engaging in solicitation, discussions, or negotiations of competing proposals.

On April 25, Cirrus CFO Peter McDermott spoke over the telephone with Fitzgerald about the terms of the LOI. Fitzgerald later received a copy of it from his close friend on the Board, Hitchcock. The next day, Millard and Fitzgerald paid a visit to the company's Duluth headquarters, where Hesson spoke with Millard and Fitzgerald about the LOI.

Shortly after visiting the company's facilities, Millard began an aggressive campaign to win over the support of Cirrus for a deal to be structured by him. Millard and Fitzgerald met with Alan Klapmeier in Chicago, and Millard shared his interest in doing business with Cirrus. Millard expressed to Klapmeier his concern that control of Cirrus was being sold to a non-American entity, and pressed him hard to rethink Cirrus's strategy. Millard also spoke with Hitchcock, sharing his feelings on the weaknesses of plaintiff's offer, and he contacted both Hitchcock and Atalla to see if they would be interested in becoming investors in AeroGlobal.

At the same time, plaintiff was moving forward with due diligence, sending a team of consultants to Cirrus. Plaintiff also extended a $4 million loan to Cirrus to satisfy a need for operating capital. Plaintiff also claims that it or its consultants helped Cirrus to improve the production facilities by introducing new manufacturing techniques that resulted in a material reduction in time and cost of production, and contributed to other improvements in Cirrus's business and operations.

## E. Negotiation of the Stock Purchase Agreement

Negotiations proceeded throughout May on the Stock Purchase Agreement ("SPA"). At some point, Alan Klapmeier learned that certain Cirrus stockholders who had earlier expressed interest in selling their shares to plaintiff as part of the deal were no longer interested in doing so. Because plaintiff still wanted to purchase the full 61 percent of the equity, the deal was restructured so that plaintiff would contribute all $77.5 million cash to Cirrus. In exchange, plaintiff would still receive 61 percent of the outstanding common stock, on a fully converted and diluted basis.[3] Cirrus would then declare a $15 million dividend payable to all common stockholders except plaintiff, making the effective purchase price $3.72 per share ($2.79 per share for the cash contribution, plus a per-share dividend of $0.93).

## F. AeroGlobal's Efforts

Throughout May, AeroGlobal continued its pursuit of a deal with Cirrus. On May 16, AeroGlobal faxed the outline of a proposal to Alan Klapmeier. The terms of the May 16 proposal were that AeroGlobal would invest up to $45 million in return for shares of the common stock at a price of $4.25 per share in a non-change of control transaction.

Alan Klapmeier quickly informed Dyslin of the May 16 AeroGlobal proposal and gave him a copy of it. Dyslin and Crescent expressed concern that Cirrus was

mercial activities of FIIB and its potential investors.

**3.** Cirrus and its advisers apparently did not appreciate the full potential dilution to the common equity posed by the terms of the SPA

until mid-June when they prepared dilution schedules for use in proxy materials. Cirrus attempted to renegotiate the terms of the warrants but was rebuffed.

not honoring the confidentiality/no-shop provisions of the LOI but did little to enforce those terms.[4] As negotiations progressed, Klapmeier expressed his concern to Dyslin and other representatives of plaintiff that unless the proposal with AeroGlobal was explored, the Board's vote on a proposed transaction with plaintiff might not be unanimous, and Cirrus's shareholders might not approve. The parties agreed that, once the SPA was signed, Cirrus would have the opportunity to further investigate the AeroGlobal proposal.

### G. Execution of the Stock Purchase Agreement and Side Letter

The Cirrus Board met to consider the terms of the SPA on June 6 and June 7. On June 7, the Cirrus Board approved the transaction, and the SPA was executed. Under the terms of the SPA, Alan and Dale Klapmeier each would receive up to $4.9 million over a five year period, and each would receive warrants exercisable for 3 percent of Cirrus stock on a fully-diluted basis.

The SPA provides that the Cirrus Board should, *inter alia,* cause a special meeting of the shareholders to convene on or before June 26, 2001, recommend to the shareholders the adoption and approval of the transaction, prepare proxy material soliciting approval of the transaction, and provide the required notice of the meeting to the shareholders.

Also, included in its terms is a "no-shop" and "no-talk" provision, which states in relevant part that neither Cirrus nor any party working on behalf of Cirrus shall:

(a) solicit, initiate or encourage the submission of any Acquisition Proposal [broadly defined in the SPA] or (b) initiate or participate in any discussions or negotiations regarding, or furnish to any Person any information with respect to, or take any other action to encourage or facilitate any inquiries or the making of any proposal that constitutes, or could be expected to lead to, any Acquisition Proposal.[5]

Section 7.3.1 goes on to provide for a narrowly-crafted exception to the "no-talk" provision found in subsection (b) quoted above. This provision is important to plaintiff's argument in support of the motion for preliminary injunction and will be quoted in full. It reads as follows:

Notwithstanding anything to the contrary contained in this Section 7.3 or in any other provision of this Agreement, the Cirrus Board, in response to a Superior Proposal (as defined in Section 7.3.2) which did not result from a breach of this Section 7.3.1, at any time prior to the date ten (10) days after the date hereof (the "Open Window"), may (x) participate in discussions or negotiations with or furnish information to any Person (other than a Cirrus Related Person) (a *"Potential Acquiror"* ) which makes a Superior Proposal that is submitted to Cirrus by such Potential Acquiror after the date hereof and (y) approve or recommend such Superior Proposal to the Cirrus Stockholders if, prior to any such action, the Cirrus Board determines in good faith, after consultation with Cirrus' outside financial and legal advisors, that to do otherwise would violate the fiduciary duties

---

4. Indeed, the record now reveals that Hitchcock spoke regularly and openly with Fitzgerald concerning the progress of the negotiations with plaintiff. While Cirrus does not "condone the breaches ... apparently engaged in by one of its Board members," Cir-

rus does argue that Crescent also breached the LOI's confidentiality provisions in disclosing information about the LOI.

5. Section 7.3.1, SPA.

of the Cirrus Board and not be in the best interests of the Cirrus Stockholders.[6]

Under the terms of the SPA, a "Superior Proposal" is "any bona fide Acquisition Proposal which is reasonably likely to result in terms and consideration which are, viewed in the aggregate, more favorable to Cirrus and the Cirrus shareholders than [plaintiff's proposal], considering all relevant factors...." [7] Finally, Cirrus was to notify plaintiff if it received any Acquisition Proposal, or any inquiry which could lead to one, and of any Board meeting to consider such a proposal.[8]

To address Cirrus's need to explore the AeroGlobal May 16 proposal, the parties also entered into a Side Letter on June 7, that provides that Cirrus and the Cirrus Board were entitled "to communicate with [AeroGlobal] regarding its proposal dated May 16, 2001 ... through June 14, 2001 without such communication being deemed to be a violation of Section 7.3 of the ... Agreement." The initial draft of this letter was prepared by Cirrus's counsel and took a different approach to the problem. It would have, for purposes of Section 7.3.1 of the SPA, deemed the AeroGlobal May 16 proposal a "Superior Proposal" and provided that "Cirrus and the Cirrus Board of Directors shall be entitled to take all permitted actions with respect to [it] ... permitted in such section during the Open Window...." The alternative language, found in the Side Letter, was proposed by plaintiff's counsel.

The Cirrus parties uniformly testified that they negotiated and agreed on a ten-day period for the Open Window and that the ten-day period would be counted, as is normally the case, by excluding June 7. Thus, in their understanding, the Open Window extended until Sunday, June 17. Moreover, this was consistent with their understanding that the Side Letter was to provide for a seven-day period following which the Cirrus Board was to have three days to reach a conclusion on any transaction proposed by AeroGlobal. Thus, because the Side Letter ran through June 14, they understood that the Open Window would run through June 17.

As it happened, however, when Cirrus's counsel drafted the language in the Open Window describing its duration, he defined it as "any time prior to the date ten (10) days after the date hereof." Carefully read, this circumlocution means the same thing as "nine (9) days from the date hereof" and describes a period of time ending on June 16 at 11:59 p.m. Although convoluted, the phrase has a meaning that plaintiff insists is unambiguous.

### H. Cirrus–AeroGlobal Negotiations and the June 14 Proposal

On June 7, representatives of Cirrus contacted AeroGlobal to arrange to meet. Late on June 7, Alan and Dale Klapmeier and Hesson flew to Rhode Island where Millard lived. Millard and Fitzgerald naturally expressed concern about whether or not the contract Cirrus had just signed permitted Cirrus to talk to them and re-

---

6. *Id.*

7. Section 7.3.2, SPA.

8. Cirrus warranted in Section 7.3.1 that as of April 24, 2001 (the date of the LOI): "Cirrus [and all related parties] ceased and terminated ... all discussions or negotiations with any Person (other than Crescent Capital and Pur-

chaser) in respect of any possible Acquisition Proposal, except as disclosed in writing to Purchaser prior to the date hereof, and that such obligations to cease and terminate all such discussions or negotiations with any Person (other than Crescent Capital and Purchaser) shall continue after the execution and delivery of this Agreement." (Section 7.3.1).

quired, as a condition to meeting, that they be permitted to review the key no-shop and termination provisions in the SPA, including the amount of the termination fee. Satisfied that contacts were permitted by the Side Letter, AeroGlobal's Moe, Isham, and Fitzgerald met with the Klapmeiers and Hesson at Millard's home in Newport on June 8, and engaged in discussions about a possible transaction along the lines described in the May 16 proposal.

Working under the short time constraints imposed by the Side Letter, Aero-Global asked Cirrus to share with them what it did not like about plaintiff's proposal. Cirrus shared its concern regarding plaintiff's acquisition of a majority interest in Cirrus as well as the excessive de-leveraging contemplated by the SPA.

Over the next few days, Cirrus provided documents to AeroGlobal including the financial statement and information about its rather complex capital structure. This included some information developed in the course of plaintiff's due diligence. On June 14, AeroGlobal submitted a written proposal. The draft proposal was essentially the same as the final transaction ultimately entered into by Cirrus and Aer-oGlobal. It provided for an immediate bridge loan of $15 million, for which warrants convertible to stock would be issued to AeroGlobal at a price no lower than $4.25 per share and no higher than $6.00 per share. Upon negotiation and approval of a definitive stock purchase agreement, AeroGlobal would provide an additional $30 million, and Cirrus would arrange to convert into equity $10 million of its existing debt. The proposed transaction did not involve a change of control, as Aero-Global would acquire only 38 percent of the Cirrus equity. There was no specific provision for additional compensation to management, including Alan and Dale Klapmeier.[9]

Cirrus's Finance Committee met later on June 14 to consider the terms of the AeroGlobal proposal. While Alan Klapmeier considered the June 14 proposal to be a "Superior Proposal," Hitchcock's notes from the meeting suggest that Atalla expressed his belief that the proposal would only be superior to the SPA if Aero-Global put an additional $10 million up front in the deal. In an e-mail to Moe, Hesson requested the additional up-front payment and suggested that Millard "pledge or assign CD's pending the second payment" of the bridge loan. The suggested changes were added to the draft AeroGlobal Letter of Intent and forwarded to Moe later that day.

The proposed changes in the transaction were angrily rejected by AeroGlobal and caused the process to breakdown by the end of the day. Dale Klapmeier testified that he put the June 14 proposal in the shredding machine at around midnight that same night. The Side Letter expired at 11:59 p.m. June 14. The next day, Alan Klapmeier telephoned Dyslin and shared with him the events of the previous night.

## I. AeroGlobal Resubmits its June 14 Proposal in Final Form

Discussions between AeroGlobal and Cirrus resumed on June 15, by way of a conference call, and the signed AeroGlobal Letter of Intent was forwarded to the Cirrus Board on June 15. Alan Klapmeier wrote to Dyslin to give notice that Cirrus

---

9. AeroGlobal values its deal at $4.25 per share. Plaintiff argues that the true value of this deal was actually "substantially under $4.00 per share." This is because AeroGlobal will take a 5 percent fee off the top of any funds advanced to Cirrus (either investments or loans) as well as dilutive warrants issued in connection with the bridge loan. AeroGlobal also includes the $5 million break-up fee in its calculation.

had received an Acquisition Proposal and that the Board would meet to consider it on the following day. Cirrus's legal advisers, financial advisers, and management prepared Board presentations comparing the merits of the two different proposals.

The Board met to consider the terms of the AeroGlobal Letter of Intent on June 16. After Dorsey & Whitney made a presentation to the Cirrus Board regarding its fiduciary obligations, Ernst & Young made a presentation comparing both deals, and Alan Klapmeier made a presentation regarding management's comparison of the proposals. AeroGlobal was invited to join the Board meeting and discuss its vision for the company. The Board then considered the comparative merits of the two proposals but decided to put off a final vote until the next day, so that its members could "sleep on" the matter. However, a "straw poll" of the directors taken at that meeting showed their unanimous support for the AeroGlobal deal.

## J. The Deal with AeroGlobal Closes

According to plaintiff, the Open Window period for considering a Superior Proposal closed on June 16 at 11:59 p.m. The Cirrus Board met again on the morning of June 17 to consider the AeroGlobal Letter of Intent. Before the Board meeting, Dyslin contacted Alan Klapmeier and communicated slightly improved terms for the transaction with plaintiff. The Board determined that the AeroGlobal proposal was a "Superior Proposal" within the meaning of the SPA. Thereafter, the Cirrus Board finally passed three resolutions: (1) the AeroGlobal Letter of Intent was conditionally approved,[10] (2) the transaction with plaintiff was terminated because of the Superior Proposal, and (3) the Cirrus

Board withdrew its recommendation to the shareholders that the transaction with plaintiff be accepted.

Before implementing these decisions, the directors sent Alan Klapmeier to ask Dyslin for a one-day extension of the Open Window to allow them to engage in further negotiations with plaintiff over its deal. Dyslin orally agreed to this extension. But he later spoke to his counsel who told him that the Open Window had already closed and, therefore, there was nothing to extend. As a consequence, Dyslin never executed the form of extension drafted by Cirrus's counsel.

On June 18, Cirrus received word that the Open Window would not be extended. Alan Klapmeier then executed the deal with AeroGlobal. After it received the first $5 million from AeroGlobal, Cirrus notified plaintiff that it was terminating the SPA pursuant to Section 11.1.7 (termination "[b]y ... Cirrus (provided Cirrus makes the payment to Purchaser specified in Section 11.3.1) ... if Cirrus consummates an Alternative Transaction") and tendered payment of the $5 million termination fee pursuant to Section 11.5 of the SPA.

On June 21, Cirrus received another $7 million from AeroGlobal.

## K. Plaintiff's Response

Dyslin responded with a letter on June 18 sharply criticizing the Board for its actions, demanding payment of the termination fee, repayment of the bridge loan, warning of litigation regarding breach of the SPA, and pursuing enforcement of several of the SPA's provisions. These provisions included requiring Cirrus to mail supporting proxy statements to Cirrus's

---

**10.** This was conditioned on Alan Klapmeier's success in getting an extension of the Open Window. If he were successful, then the deal would not be approved to allow for more time to explore further developments with plaintiff.

shareholder, to hold the shareholder meeting on June 26, and to do everything possible to persuade the shareholders to vote for the deal with plaintiff, as well as requiring the Board to vote their shares for the deal with plaintiff and requiring Alan Klapmeier to go on the road to persuade shareholders to vote in favor of the deal.

On June 20, plaintiff sent Cirrus a proposal to amend its transaction. While the proposal still provided that plaintiff would acquire 61 percent of Cirrus for $77.5 million, the dividend payable to shareholders would be increased to $1.40 per share. After reviewing the revised proposal, the Finance Committee decided not to go forward on it.

### L.  Initiation of Litigation

On June 27, 2001, plaintiff filed a verified complaint in this court for declaratory and injunctive relief. Plaintiff seeks enjoinment of "Cirrus from taking any further steps to proceed with any proposed transaction with AeroGlobal, including the mailing of proxy materials and holding a special meeting of stockholders to vote on a AeroGlobal proposal." Moreover, plaintiff seeks an injunction "compelling Cirrus as provided in Section 13.4 of the Agreement to comply with its obligation under the Agreement, including the obligations under Section 7.7 of the Agreement...." Filed as well with its brief was plaintiff's motion for a Temporary Restraining Order.

During a teleconference held with the court on June 28, 2001, plaintiff withdrew its motion for a TRO after being advised that proxy materials would not be distrib-

uted before July 20, 2001. Plaintiff then filed its motion for a preliminary injunction requesting an order barring Cirrus from "taking any further steps to proceed with any proposed transaction [with AeroGlobal] ... including the mailing of proxy materials and holding a special meeting of stockholders." Oral argument on plaintiff's motion for preliminary injunction was held on July 17, 2001.

### III.  LEGAL ANALYSIS

#### A.  Legal Standards

■ Preliminary injunctive relief will be granted only where the moving party demonstrates (1) a reasonable probability of success on the merits, (2) irreparable harm if the injunction is not granted, and (3) a balance of equities in favor of granting the relief.[11] Moreover, a preliminary injunction is an extraordinary remedy, which will not issue unless it has been earned and will be denied where the remedy sought is excessive in relation to, or unnecessary to prevent, the injury threatened.[12] The extraordinary remedy "is granted only sparingly and only upon a persuasive showing that it is urgently necessary, that it will result in comparatively less harm to the adverse party, and that, in the end, it is unlikely to be shown to have been issued improvidently."[13]

■ In addition, where, as here, the plaintiff ultimately seeks relief in the form of a decree of specific performance, the court must keep in mind, in assessing the reasonable likelihood of success, that the plaintiff will bear the burden of establish-

---

11.  *Unitrin, Inc. v. American General Corp.,* Del.Supr., 651 A.2d 1361, 1371 (1995); *SI Management L.P. v. Wininger,* Del.Supr., 707 A.2d 37, 40 (1998); *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* Del.Supr., 506 A.2d 173, 179 (1986).

12.  *Ivanhoe Partners v. Newmont Mining Corp.,* Del.Ch., 533 A.2d 585, 600 (1987), *aff'd,* Del. Supr., 535 A.2d 1334 (1987).

13.  *Cantor Fitzgerald LP v. Cantor,* Del.Ch., 724 A.2d 571, 579 (1998).

ing its case by "clear and convincing" evidence.[14]

## B. Likelihood of Success on the Merits

### 1. The Termination Provisions

■ The defendants argue that Cirrus effectively terminated the SPA when it gave notice of termination on June 18, 2001 and tendered the $5 million termination fee. They further argue that the SPA provides that, once that fee was paid, it was plaintiff's exclusive remedy at law and precluded plaintiff from seeking any equitable remedy, such as the interim injunctive relief and final decree of specific performance it seeks in this proceeding.

Discussing this argument requires some familiarity with the workings of Section 11. That section's subparts are captioned: *Termination* (Section 11.1), *Effect of Termination* (Section 11.2), *Amounts Payable in Connection with Certain Terminations* (Section 11.3), *No Penalty* (Section 11.4), and *Limited Exclusivity* (Section 11.5). Of particular concern are Sections 11.1, 11.3, and 11.5.

Cirrus first purported to terminate the SPA under Section 11.1.7. This section provides as follows:

> 11.1. *Termination.* This Agreement may be terminated at any time prior to the Closing, whether before or after the Special Meeting, under the provisions of any of the following subsections of this Section 11.1 which are applicable:

> 11.1.7. By either Cirrus (provided Cirrus makes the payment to Purchaser specified in Section 11.3.1 [15]) or

the Purchaser if Cirrus consummates an Alternative Transaction.

Section 11.3 defines the circumstances requiring the payment of the termination fee to plaintiff and the method of computing the amount of such fee. There is a general agreement among the parties that, if the termination notice given by Cirrus under Section 11.1.7 is effective, the amount of the fee now payable to plaintiff is $5 million, or approximately 6.5 percent of the value of the transactions contemplated by the SPA.

Section 11.5 defines the extent to which the receipt of the termination fee is to be plaintiff's exclusive remedy. That section provides as follows:

> 11.5 *Limited Exclusivity.* In the event the Cirrus Termination Fee is paid to Purchaser pursuant to Section 11.3, such payment shall be the exclusive remedy at law of Purchaser, and Purchaser shall not be entitled to any further or other rights, claims or remedies at law all of which further rights, claims and remedies Purchaser irrevocably waives; *provided,* that the Section 11.5 shall not preclude the exercise by Purchaser of any additional remedies at law at any time following a termination of this Agreement upon the failure of Cirrus to pay the Cirrus Termination Fee pursuant to Section 11.3. Nothing in the Section 11.5 shall limit the rights of the Parties to exercise any equitable remedies available under Section 13.4; [16] *provided,* that that Party receiving the Termination Fee shall not be entitled to exercise any such remedies following the receipt by it of the Termination Fee.

---

**14.** *Asten, Inc. v. Wangner Systems Corp.,* Del. Ch., C.A. No. 15617, 1999 WL 803965 n. 23, mem. op. at 14, Steele, V.C. (Sept. 23, 1999).

**15.** The parties are in agreement that this reference should read, instead, "Section 11.3."

**16.** Section 13.4 of the SPA is captioned *Enforcement of Agreement* and relates expressly to actions for specific performance of the contract.

The defendants take the position that Cirrus had the right under Subsection 11.1.7 to give notice of termination on June 18, 2001, because it "consummated an Alternative Transaction" when it approved the AeroGlobal transaction.[17] They further argue that Cirrus tendered and, therefore "paid" the termination fee. Thus, the argument goes, the provisions of Section 11.5 preclude both plaintiff's motion for preliminary injunctive relief and its ultimate claim for specific performance.

Plaintiff makes several arguments in response, some of which were abandoned at oral argument.[18] Its principal argument is that Cirrus had no right to terminate under Section 11.1.7 because the "Alternative Transaction" allegedly "consummated" resulted from a breach of the SPA. Thus, plaintiff argues:

> The defendants' audacious argument that consummation of any Alternative Transaction—even one consummated in willful breach of the Agreement—triggers the right to terminate the Agreement under Section 11.1.7 is flatly contrary to law, is unsupported by the language of the Agreement and would

render meaningless the carefully crafted termination provisions of Section 11.

To support its position on the law, plaintiff cites general principles of contract law that a party in breach cannot exercise a right of termination or cancellation.[19] Critically, the authorities cited by plaintiff do not deal with termination rights conditioned on the payment of a contractually defined "termination fee." Plaintiff quotes from *Corbin on Contracts* to the effect that "[a] party who has reserved a power of termination loses that power if he himself commits such a breach as goes to the essence and discharges the other party."[20] But plaintiff's brief omits the next sentence in that treatise, which reads, "A subsequent notice of termination has no effect upon the other party's right to full damages for the existing total breach." In this case, there is no suggestion that plaintiff is not entitled to recover full damages resulting from the termination and any pre-existing breach of contract. On the contrary, Section 11.4 of the SPA states that the $5 million payment to plaintiff is intended to reflect the parties' "good faith judgment as to the amount" of "actual

---

**17.** "Alternative Transaction" is defined in Section 7.3.2. of the SPA to include "the issuance of any shares of capital stock or the right to acquire shares of capital stock of Cirrus." The transaction with AeroGlobal required Cirrus to issue rights to acquire shares of Cirrus capital stock in exchange for the $15 million initial funding of that transaction.

**18.** Among other things, plaintiff argued initially that there had been no "consummation" of an "Alternative Transaction" because only $12 million of the promised $15 million first tranche of money was paid by AeroGlobal. This argument does not wash because Cirrus has issued rights to purchase its capital stock to AeroGlobal and there is no dispute between those entities over the enforceability of those rights. Moreover, the $3 million shortfall is due entirely to the pendency of this motion and a resultant understanding between Cirrus and AeroGlobal that the completion of the

funding should be delayed pending its outcome.

Plaintiff also now concedes (having argued in its briefs) that there is no issue as to whether the termination fee has been "paid" or "received." Cirrus tendered that fee, which remains in an escrow account awaiting wire transfer instructions from plaintiff.

**19.** 6 A.L. Corbin, *Corbin on Contracts* § 1266 (1962); *Arizona's Towing Professionals, Inc. v. Arizona*, 196 Ariz. 73, 993 P.2d 1037, 1041 (App.1999) ("A party breaching an agreement cannot avoid liability for that breach by subsequently invoking a reserved, unilateral right to cancel the contract."); *Coastal Oil Co. v. Eastern Tankers Seaways Corp.*, 29 N.J.Super. 565, 103 A.2d 26 (App.Div.1954).

**20.** 6 A.L. Corbin, *Corbin on Contracts* § 1266 (1962).

damages suffered by [plaintiff] following a termination" of the contract. And, Section 11.5 provides that that amount of damages, once paid, is plaintiff's exclusive remedy for breach, at law and in equity. Finally, Section 11.1.7 expressly conditions Cirrus's right to terminate on payment of the agreed upon measure of damages.

The cases cited by plaintiff also do not advance its argument. In both *Coastal Oil Co. v. Eastern Tankers Seaways Corp.* and *Arizona's Towing Professionals, Inc. v. Arizona*, the courts confronted situations where a party in breach sought to avoid liability for breach by improperly relying on a right of termination. In *Coastal*, a buyer invoked a term of the contract allowing either party to terminate in the event the buyer failed to obtain necessary governmental approvals by a date certain.[21] Because the buyer's failure to obtain such approvals resulted from its own breach of warranty, the court excused performance of the later condition and found the subsequent termination ineffective to avoid liability.[22] *Arizona's Towing* is even less apt, involving a decision that a state agency could not properly invoke a power of termination for convenience to render moot an administrative appeal by a low bidder on a contract.[23] Neither of these cases addresses itself expressly to a right to terminate that is itself conditioned on payment of a contractually agreed upon measure of full damages.

Plaintiff's argument that defendants' position is "unsupported by the language of the Agreement" is, if anything, more difficult to accept. Certainly, there is nothing in the plain language of Section 11.1.7 that supports plaintiff's reading. On the contrary, the plain language of Section 11.1.7, read in isolation, clearly supports defendants' view. Instead, plaintiff argues that I should read into Section 11.1.7 words to the effect that any Alternative Transaction that is the predicate for a notice of termination under that section *did not result from a breach of the SPA and, in particular, the lock-up provisions of Section 7.3.1.* At least in the context of this application for preliminary injunctive relief, I find myself unpersuaded by ·this argument. Indeed, there are obstacles in the text of SPA itself (in addition to the language and structure of Section 11 already discussed) that leave me unconvinced that the interpretation urged by plaintiff is the correct one. For example, the same language plaintiff urges me to read into Section 11.1.7 is found expressly in Section 7.3.1, limiting the Cirrus Board's ability to respond to a Superior Proposal to those "which did not result from a breach of this Section 7.3.1." The presence of those words in Section 7.3.1 suggests, if anything, that the parties did not agree or intend to impose the same limitation on the universe of "Alternative Transactions" giving rise to a right to terminate under Section 11.1.7.[24] Moreover, it is hard to reconcile plaintiff's argument with the language of Section 11.5, which plainly contemplates the termination of the contract

**21.** 103 A.2d at 32.

**22.** *Id.*

**23.** 993 P.2d at 1042.

**24.** I also note that there is no similar gloss found in Section 7.7.2, which relates to the Cirrus Board's ability to modify or withdraw its recommendation in favor of the SPA where "a Potential Acquiror has submitted a Superior Proposal." Nor is there similar limiting language in the definition of Superior Proposal itself, found in Section 7.3.2. It is possible that the various formulations of words found in different sections of the SPA have some cohesive meaning that supports plaintiff's interpretation of Section 11.1.7. Suffice it to say that no such cohesive explanation has been offered to this point.

and payment of the agreed upon measure of damages in situations where Cirrus is in breach of the contract.

Finally, plaintiff argues that it is necessary to restrict the scope of the right of termination found in Section 11.1.7 to the contract in order to give effect to its paramount interest in acquiring control of Cirrus. Viewing the contract as a whole, it is reasonable to infer that plaintiff's main objective in entering into the SPA was to acquire Cirrus, not to get paid the termination fee described in Section 11 of that agreement. Nevertheless, it is also true that the plain language and structure of Section 11, including the scope of the exclusivity provisions of Section 11.5, are both consistent with the interpretation urged by defendants and conducive of plaintiff's purpose of using the termination fee to ward off competing bids. The $5 million "termination fee," while perhaps not large in its absolute amount, is unusually high as measured by its relationship to the dollar value of the plaintiff's deal. Having to pay that amount as the price of doing another transaction could deter some potentially interested bidders.

For these reasons, I conclude that the plaintiff has not met its burden, at this stage of the proceedings, of showing a reasonable probability that it will ultimately succeed on the merits of its application for a decree of specific performance. This conclusion is based, importantly, on my preliminary conclusion that the structure of the termination provisions and the exclusive character of the termination fee payment operate to give Cirrus the right to terminate the contract under Section 11.1.7 even if the Alternative Transaction giving rise to that right resulted from a breach of the "no-shop" or "no-talk" provisions of Section 7.3.1, or of some other provision of the SPA. In a later section of this opinion, I will discuss whether plaintiff has shown a reasonable probability that the AeroGlobal deal was approved in violation of Section 7.3.1 or other provisions of the contract.

Before turning to that question, I note that Cirrus has recently given notice of termination under Section 11.1.6 [25] due to the fact that the Closing under the SPA did not occur by July 15, 2001, and under Section 11.1.5,[26] due to AeroGlobal's having filed a counterclaim in this action seeking the invalidation of portions of the SPA. Unlike Section 11.1.7, neither of these rights of termination is expressly conditioned on the payment of the termination fee. Nor would either give rise to a right to be paid that fee in the absence of some other circumstance described in Section 11.1. For those reasons, Cirrus's exercise of its right to terminate under either provision raises different and more troubling legal issues than those just discussed. For example, the authorities discussed above might well preclude Cirrus's exercise of a right to terminate under Section 11.1.6, since the failure of the condition that Closing occur by July 15, 2001 was caused by Cirrus's own lack of performance. Similarly, I question whether the filing of a counterclaim in this action by AeroGlobal, which is alleged to have participated in Cirrus's breach of contract, is an adequate basis to invoke the termination provisions of Section 11.1.5.

**25.** Section 11.1.6 provides a right of termination: "By either Cirrus or Purchaser by Notice to the other Party, if for any reason the Closing has not occurred on or before July 15, 2001 (the "Termination Date")."

**26.** Section 11.1.5 provides a right of termination: "By either Cirrus or Purchaser by Notice to the other Party, . . . if a Governmental Body or any other Person shall have initiated a Proceeding seeking to deem any portion of this Agreement unenforceable. . . ."

## 2. Breach of the Stock Purchase Agreement

I turn next to the question of whether the AeroGlobal proposal resulted from breaches of the SPA. The SPA provides a limited fiduciary out (the "Open Window") allowing the Cirrus Board to consider alternative acquisition proposals. However, this Open Window was only available "in response to a Superior Proposal ... *which did not result from a breach of this Section 7.3.1 ....*"[27] Because Cirrus allegedly committed a series of breaches of Section 7.3.1 which resulted in the AeroGlobal proposal, plaintiff argues that "the Cirrus Board was not permitted by the terms of the fiduciary out to consider or approve it." After considering the examples cited by plaintiff, I am unconvinced that plaintiff will prevail on the merits of its claims.

### a. Breach of Representation

■　First, plaintiff argues that Cirrus breached the representations and warranties provision of Section 7.3.1, which states:

Cirrus represents and warrants to Purchaser that as of the execution and delivery of the Letter of Intent, dated April 24, 2001, among Purchaser, Crescent Capital and Cirrus (the *"Letter of Intent"*), Cirrus ceased and terminated, and caused each of the Cirrus Subsidiaries [and all its related parties] to cease and terminate, all discussions or negotiations with any Person (other than Crescent Capital and Purchaser) in respect of any possible Acquisition Proposal, except as disclosed in writing to Purchaser prior to the date hereof, and that such obligations to cease and terminate all such discussions or negotiations with any Person (other Crescent Capital and

Purchaser) shall continue after the execution and delivery of this Agreement.

Plaintiff claims, and there is evidence to support it in this claim, this representation was false because, during the period covered by the representation, and, to an extent, undisclosed to plaintiff, Cirrus representatives engaged in negotiations with AeroGlobal. For example, director Atalla, "actively assist[ed] AeroGlobal to gather information about Plaintiff's proposal and to formulate its own bid." Additionally, plaintiff points to the fact that director Hitchcock also dealt directly with AeroGlobal on several occasions throughout the LOI period.

Defendants do not seriously contest the falsity of the representation made by Cirrus in Section 7.3.1. Nevertheless, the plaintiff cannot show any causal connection between the breach of the representation (as opposed to the occurrence of the matters misrepresented) and the proposal.[28] Since that proposal did not "result from a breach" of the representation, the claimed breach of contract did not disqualify the AeroGlobal proposal from consideration by the Cirrus Board. Under the circumstances, I cannot conclude based on the record before me that plaintiff's have shown a reasonable likelihood of success on the merit of this claim. Therefore, I will focus on defendant's post-June 7 behavior.

### b. Breach of the Side Letter

■　Plaintiff argues that Cirrus violated Section 7.3.1 by negotiating with AeroGlobal in a manner that exceeded its rights under the June 7 Side Letter. The Side Letter states in part:

Cirrus and AeroGlobal and knew of the May 16 proposal from AeroGlobal.

---

**27.** Section 7.3.1, SPA (emphasis added).

**28.** I say this bearing in mind that plaintiff knew there had been some contacts between

The parties hereto agree that Cirrus and the Cirrus Board of Directors shall be entitled to communicate with Aero-Global ... regarding its proposal dated May 16, 2001 ... until June 14, 2001 without such communications being deemed to be a violation of Section 7.3 of the [SPA].

Plaintiff argues, "The purpose of this right to communicate was for Cirrus to get more information from AeroGlobal about the cryptic and abbreviated May 16 Aero-Global Proposal to determine whether it was worthy of consideration as a 'Superior Proposal.'" It was not a "carte blanche" opportunity to negotiate. At oral argument, plaintiff's counsel explained further that the Side Letter was simply a limited exception to the no-shop provision in Section 7.3.1(a).[29]

▮▮▮ In considering the proper interpretation of the Side Letter, I must bear in mind that the transaction proposed in the SPA is a change of control transaction and implicates the Cirrus directors' heightened duties under Delaware law "to secure the best value reasonably available to the stockholders," as the Supreme Court held in *Paramount Communications, Inc. v. QVC Network, Inc.*[30] As part of this duty,

directors cannot be precluded by the terms of an overly restrictive "no-shop" provision from all consideration of possible better transactions.[31] Similarly, directors cannot willfully blind themselves to opportunities that are presented to them, thus limiting the reach of "no talk" provisions.[32] The fiduciary out provisions also must not be so restrictive that, as a practical matter, it would be impossible to satisfy their conditions.[33] Finally, the fiduciary duty did not end when the Cirrus Board voted to approve the SPA. The directors were required to consider all available alternatives in an informed manner until such time as the SPA was submitted to the stockholders for approval.[34]

With these principles in mind, I conclude that plaintiff has not carried its burden of showing a reasonable probability of success on its claim that Cirrus violated the terms of the Side Letter. First, I note as a preliminary matter, that the Side Letter does not expressly limit its effect to Section 7.3.1(a), as plaintiff suggests, but refers to Section 7.3 in its entirety, broadly providing that an activity fairly construed as "communications" about the May 16 AeroGlobal proposal would not be deemed to be a violation of Section 7.3. Further-

29. Of course, the tightly worded provisions of the so-called "Open Window" prohibit all solicitation of bids.

30. Del.Supr., 637 A.2d 34, 37 (1994).

31. *See Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, Del.Supr., 506 A.2d 173, 184 (1985) ("[t]he no-shop provision, ..., while not per se illegal, is impermissible ... when a Board's primary duty becomes that of ... selling the company to the highest bidder."); *see also McMillan v. Intercargo Corp.*, Del.Ch., 768 A.2d 492, 502 (2000) (board of directors' *Revlon*-duties to secure the highest value reasonably attainable applies not only in the context of break-up, but also in a sale of control).

32. *See Phelps Dodge Corp. v. Cyprus Amax Minerals Co.*, Del.Ch., C.A. Nos. 17398,

17383, 17427, Chandler, C., 1999 WL 1054255 (Sept. 27, 1999) ("No talk provisions ... are troubling precisely because they prevent a board from meeting its duty to make an informed judgment with respect to even considering whether to negotiate with a third party."); *see also Barkan v. Amsted Indus., Inc.*, Del.Supr., 567 A.2d 1279, 1287 (1989) ("The need for adequate information is central to the enlightened evaluation of a transaction that a board mush make.").

33. *See QVC*, 637 A.2d at 51 (articulating a reasonableness standard for defensive measures taken in a sale of control).

34. *Id.* at 48–49.

more, I read the word "communicate" to have a broader meaning than that proffered by plaintiff in its briefs and at oral argument.

As an example of the conduct complained of, plaintiff's brief contends that Cirrus violated the Side Letter by disclosing the Open Window, termination and break-up fee provisions of the SPA. This contention is bewildering. AeroGlobal and Millard were keenly aware of the possibility of a high break-up fee as well as the possibility of a suit for tortious interference with contract. Thus, it was inevitably true that Cirrus would need to disclose to AeroGlobal the Open Window and termination provisions of the SPA. If the Side Letter did not permit this level of "communication" it would have been a sham. Perhaps as importantly, plaintiff points to nothing in the SPA itself that purports to prevent disclosure of the SPA or its terms to anyone, including AeroGlobal.[35]

### c. Breach of 7.3.1 Open Window Procedure

■ Next, I turn to plaintiff's argument that Cirrus's actions on June 15 and 16 in relation to the AeroGlobal proposal were in breach of Section 7.3.1. Plaintiff argues that, after the expiration of the Side Letter on June 14, Cirrus was disabled from continuing its discussions with AeroGlobal, even though AeroGlobal had made a proposal, unless and until the Cirrus Board first met and made the determination described in the Open Window that its fiduciary duties required that it continue such discussions. Only then could Cir-

rus management and advisers negotiate a final proposal from AeroGlobal, reconvene the Cirrus Board and present the deal for their consideration. As I will discuss next, all of this was to have happened in 2 days, according to plaintiff. The consequence of this breach of contract, plaintiff's argument continues, is that the AeroGlobal proposal was the result of a breach of Section 7.3.1 and, therefore, was disqualified from any further consideration.

I conclude that plaintiff has little likelihood of success on the merits of this claim. There is evidence before me that the Finance Committee of Cirrus's Board of Directors met on June 14 to consider the terms of AeroGlobal's proposal, and decided that AeroGlobal's proposal should be reviewed by the entire Board. That committee also appears to have agreed that management should engage in negotiations with AeroGlobal over certain terms of its proposal. Alan Klapmeier stated in his deposition, "I believe we made that decision [to call the Board meeting] Thursday afternoon [June 14] at the finance committee meeting where everyone agreed we had a proposal, we should look at it." [36] Given the short period of time left in the Open Window, I must infer from this record that the Cirrus Board and its advisers substantially complied with the difficult and contrived terms of the Open Window. Moreover, I note that whatever technical breach may have occurred is simply too slender a reed on which to rest the onerous relief sought by the plaintiff—disqualification of a competing transaction that the

---

35. The actual confidentiality provision of the SPA is found in Section 7.11.1. It does not prevent disclosure of the agreement itself, but only of "information obtained from ... [another] Party in connection with the Contemplated Transactions...."

36. A. Klapmeier Dep. at 156. While the SPA does state that a determination shall be made by the "Board," 8 *Del. C.* § 141(c) permits delegation of duties to committees and there is some evidence in the record that the Finance Committee frequently met between meetings of the Cirrus Board to consider business items of this nature.

Cirrus Board has determined, in good faith, is a "Superior Proposal."

### d. Approval of the AeroGlobal Proposal after the End of the Open Window

■ Finally, plaintiff (reading the contract literally in this context) argues strenuously that the Cirrus Board breached the SPA by approving the AeroGlobal transaction after the Open Window period expired. Thus, the argument goes, the decision of the Cirrus Board to delay its final consideration of the AeroGlobal deal overnight so its members could "sleep on" the matter was a fatal misstep that renders the Board's approval of that transaction the following day void and in breach of the contract.

Reading the contract literally, plaintiff is correct that the Open Window provision ended hours before the Cirrus Board acted on the competing proposal. And, no doubt in many contexts, contractually bargained-for time limitations can be of critical importance. Here, however, having carefully reviewed the record of Cirrus's negotiation with AeroGlobal and its efforts to comply with the terms of the Open Window, I am unwilling to conclude that the fact that the Board finished its consideration of the AeroGlobal proposal some hours after the deadline is a material default on their part.

In addition, there is a strong record before me that the parties actually bargained for a ten-day Open Window and that it was one of plaintiff's lawyers who

crafted the language of Section 7.3.1 in such a way as both to incorporate a reference to "ten (10) days" but only provide a nine-day window. In the circumstances, there is a reasonable prospect that if the provision is (as plaintiff now contends) such an important element of the contract, there are grounds for its reformation.[37]

## C. Irreparable Harm

■ In Section 13.4 of the SPA, Cirrus expressly acknowledged and agreed that plaintiff "would be damaged irreparably in the event any of the provisions of this agreement are not performed in accordance with their specific terms." This Court has repeatedly held that contractual stipulations as to irreparable harm alone suffice to establish that element for the purpose of issuing preliminary injunctive relief.[38] Nevertheless, even if I were to conclude that there was a reasonable probability of success on the merits of plaintiff's claim, other practical considerations weigh against entering the injunctive relief sought.

The SPA remains subject to the approval of Cirrus's stockholders, in a complex voting procedure. Thus, the ultimate relief sought, specific enforcement of the SPA, will require a court-ordered meeting of Cirrus stockholders to consider a transaction their directors no longer even recommend.[39] Moreover, the vote that would be needed to approve the transaction would be a particularly difficult one to achieve. Plaintiff's transaction contem-

**37.** *In re McCall,* Del.Ch., 398 A.2d 1210 (1978).

**38.** *True North Communications Inc. v. Publicis S.A.,* Del.Ch., 711 A.2d 34, 44 (1997); *Vitalink Pharmacy Services, Inc. v. Grancare, Inc.,* Del.Ch., C.A. No. 15744, Jacobs, V.C., 1997 WL 458494 (Aug. 7, 1997), mem. op. at 23–24.

**39.** I note, in passing, although I do not consider, Cirrus's argument that it is legally disabled from convening a meeting of stockholders to vote on proposed charter amendments that the Cirrus Board no longer recommends for approval. For this argument, it cites *Smith v. Van Gorkom,* Del.Supr., 488 A.2d 858 (1985) and the 1998 amendments to Section 251(c) of the DGCL.

plates a series of amendments to the Cirrus charter, both to authorize the issuance of additional common stock and to force the conversion of each of the series of preferred stock into common. As I understand it, to obtain the necessary approvals for this transaction will require the affirmative vote of a majority of the capital stock voting together as a class, as well as a majority of *each class* of preferred stock voting separately. In addition, under the terms of the SPA, the obligation of Cirrus to consummate the transaction is expressly conditioned on the requisite vote of Cirrus's stockholders having been obtained.[40] Thus, if any one of the class votes needed is not obtained, the SPA dies.

Cirrus and AeroGlobal argue that the record evidence shows that the necessary vote cannot be achieved. Cirrus submitted the affidavit of Dennis Elbert, who holds a majority of the Series B Preferred Stock (502,475 shares of 925,457 total shares, or 54.3 percent). In his affidavit, Elbert states, "I currently intend to vote my shares in favor of approval of the AeroGlobal deal, which I view to be a superior proposal, from a business standpoint, to the Crescent deal." Of course, if Elbert voted his Class B shares against the proposal, it would fail. Similarly, Alan and Dale Klapmeier and their father Larry, who together own a majority of Cirrus's common stock (5,299,572 shares of 7,737,-520 total shares, or 68.49 percent), have stated as well that they will not vote their shares in favor of plaintiff's transaction. The Klapmeiers's and Elbert's combined total voting power exceeds 43 percent of the total voting power of the Cirrus capital stock. Clearly, there is no realistic likelihood that any proposal could succeed if those shares were voted in opposition. In light of these facts, defendants argue with

some force that any order requiring a vote would be an exercise in futility and harmful to Cirrus because of the disruption in its business and the uncertainty attending the extensive delay that would necessarily attend such a vote.

Plaintiff responds that despite this evidence, it should still have an opportunity to come before the Cirrus shareholders and fully inform them of the ramifications of not doing the deal with plaintiff. It implies that when Cirrus (and AeroGlobal) fully appreciate the arsenal of litigation claims at plaintiff's disposal, they and the Cirrus stockholders will see the light and acquiesce in the SPA. Plaintiff cites a ruling in *Kontrabecki Group, Inc. v. Triad Park, LLC*[41] for the proposition that "this Court has previously enforced similar provisions and enjoined actions that violated them."

In *Kontrabecki*, then-Vice Chancellor Steele issued a Temporary restraining order prohibiting a board from terminating a merger agreement and canceling a stockholders meeting called to consider that agreement, which actions the board sought to take in order to pursue a higher offer. The meeting was scheduled to be held two days from the date of the Temporary restraining order, at which time the merger agreement would be voted up or down.

I am not persuaded that Justice Steele's ruling in that case should control the outcome here. First, *Kontrabecki* involved the issuance of a Temporary restraining order, not a preliminary injunction, a context in which the plaintiff's merits-related burden is substantially lower. Second, unlike the situation in *Kontrabecki*, there is no meeting scheduled to consider plaintiff's proposed transaction and plaintiff is not

---

40. Section 8.1.1, SPA.

41. Del.Ch., C.A. No. 16256, Steele, V.C. (Mar. 23, 1998) (Order).

now seeking to restrain Cirrus from canceling such a meeting. Instead, it wants to prevent Cirrus from calling a meeting of stockholders for the purpose of considering the AeroGlobal deal. Only much later, after there has been a full trial on its claim for specific performance, will plaintiff be in the position to demand the meeting that was immediately available in *Kontrabecki*. Obviously, the jurisprudential considerations involved in the present application for injunctive relief are quite different that those in *Kontrabecki*, where an order of brief duration served to resolve the matters at issue. Finally, there is nothing in the record of proceedings in that case to indicate that the outcome of the vote was likely to be a foregone conclusion, as there is here. Even so, the public record reveals that the vote went strongly against the *Kontrabecki* plaintiff's transaction and in favor of the alternative transaction recommended by the Board, thus calling into question the practical utility of the relief that was granted.

## IV. CONCLUSION

The decision to grant or deny a preliminary injunction ultimately rests in the court's sound discretion. For all the foregoing reasons, and from my review of the record, the briefs filed by the parties, and the oral presentations, I am persuaded that the application for preliminary relief has not been earned and, so, should be denied. IT IS SO ORDERED.