# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

GENUINE PARTS COMPANY,     )
     )
     Plaintiff,     )
     )
     v.     )     **C.A. No. 2018-0730-JRS**
     )
ESSENDANT INC.,     )
     )
     Defendant.     )

## MEMORANDUM OPINION

Date Submitted:  June 7, 2019
Date Decided:  September 9, 2019

Kenneth J. Nachbar, Esquire, William M. Lafferty, Esquire and Thomas P. Will, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware; Richard T. Marooney, Esquire, Israel Dahan, Esquire and Peter Isajiw, Esquire of King & Spalding LLP, New York, New York; and Jeremy M. Bylund, Esquire of King & Spalding LLP, Washington, D.C., Attorneys for Plaintiff Genuine Parts Company.

Gregory P. Williams, Esquire, Lisa A. Schmidt, Esquire, Matthew D. Perri, Esquire and Angela Lam, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware and Matthew Solum, Esquire, Ian Spain, Esquire of Kirkland & Ellis LLP, New York, New York, Attorneys for Defendant Essendant Inc.

**SLIGHTS, Vice Chancellor**

Plaintiff, Genuine Parts Company ("GPC"), and Defendant, Essendant Inc., signed a Merger Agreement on April 12, 2018 (the "Agreement"). The transaction, if consummated, would have combined two competitors in the office supply wholesale business. Recognizing they could withstand the headwinds of increased competition from e-commerce and other direct-to-consumer sellers better together than apart, GPC and Essendant began discussing a business combination in the fall of 2017.

GPC was not Essendant's only suitor, however. Shortly before GPC and Essendant signed the Agreement, non-party, Sycamore Partners, expressed an interest in acquiring Essendant. The Essendant board of directors considered Sycamore's overture but said nothing about it to GPC. Five days after GPC and Essendant signed their Agreement, Sycamore formally offered to acquire Essendant allegedly at a premium to GPC's offer. The Essendant board of directors rejected Sycamore's initial offer. Undeterred, Sycamore sweetened the bid by giving assurances that more would be offered if diligence justified an increased bid. This time, the Essendant board determined Sycamore's renewed offer likely *would* lead to a better deal than the deal it had agreed to with GPC. After Sycamore completed confirmatory diligence, Essendant terminated the Agreement, paid GPC the termination fee as required by the Agreement and closed the deal with Sycamore.

The payment of the termination fee and closing of the Sycamore transaction did not end the matter from GPC's perspective. GPC maintained the termination fee was neither an exclusive remedy nor an adequate remedy to compensate for its losses following Essendant's termination of the Agreement. Specifically, GPC alleged Sycamore's winning proposal was the result of Essendant's material breaches of several provisions of the Agreement intended to protect GPC's interests—most importantly, a non-solicitation provision. When Essendant disagreed and countered that the termination fee was GPC's exclusive remedy (whether adequate or not), GPC brought this action for breach of the Agreement.

Essendant now moves to dismiss GPC's claims, arguing GPC's claim of breach fails because the Agreement is clear that the payment of the termination fee is GPC's exclusive remedy for Essendant's termination of the Agreement. As explained below, Essendant's contract-based defense is not dispositive at the pleading stage. Specifically, the Agreement does not clearly and unambiguously provide that GPC's remedy is limited to recovery of the termination fee in circumstances where, as here, GPC has well-pled that Essendant breached the Agreement's non-solicitation provision. Accordingly, Essendant's motion to dismiss must be denied.

## I. FACTUAL BACKGROUND

I have drawn the facts from the allegations in the Complaint, documents incorporated by reference or integral to the Complaint and judicially noticeable facts available in public Securities and Exchange Commission filings.[1] In resolving the motion to dismiss, I accept as true the Complaint's well-pled factual allegations and draw all reasonable inferences in Plaintiff's favor.[2]

### A. The Parties and Relevant Non-Parties

Plaintiff, GPC, is a Georgia corporation that distributes wholesale supplies and equipment for workspaces through S.P. Richards Co. ("SPR"), a "component" of GPC.[3] Defendant, Essendant, is a Delaware corporation and, like GPC, is a wholesale distributor of workplace supplies and equipment.[4] Non-party, Sycamore, is a private-equity firm whose portfolio of companies includes the well-known office supplies chain, Staples, Inc. ("Staples").[5]

---

[1] *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004) (noting the trial court may consider documents "incorporated by reference" or "integral" to the complaint on a motion to dismiss); *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 170 (Del. 2006) (noting the trial court may take judicial notice of facts in SEC filings that are "*not subject to reasonable dispute*") (emphasis in original).

[2] *Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d at 168.

[3] Verified Compl. ("Compl.") ¶ 9.

[4] Compl. ¶ 10.

[5] Compl. ¶ 4.

## B. GPC and Essendant Negotiate a Merger

Facing increasing competition in the office supply market, Essendant and GPC began discussing a combination of Essendant and SPR in the fall of 2017.[6] They eventually agreed to a transaction whereby GPC would spin off SPR to merge with Essendant.[7] Following the merger, GPC shareholders would own 51% of Essendant's common stock and Essendant's shareholders would own the remainder.[8] The parties memorialized the terms of their transaction in the Agreement dated April 12, 2018.[9]

The Agreement contained several protections for GPC, including a typical "Non-Solicitation Provision" that prevented Essendant from pursuing a competing transaction. Specifically, in Section 7.03(a), Essendant agreed not to:

> (i) solicit, initiate, or knowingly encourage (including by way of furnishing non-public information), or take any other action to knowingly facilitate, any inquiries or the making of any proposal or offer (including any proposal or offer to [Essendant's] stockholders), with respect to any Competing [Essendant] Transaction; (ii) enter into, maintain, continue or otherwise engage or participate in any discussions or negotiations with any Person in furtherance of such inquiries or to obtain a proposal or offer with respect to a Competing [Essendant] Transaction; (iii) agree to, approve, endorse, recommend or consummate any Competing [Essendant] Transaction; (iv) enter into

---

[6] Compl. ¶¶ 14–15.

[7] Compl. ¶ 18.

[8] *Id.*

[9] *Id.*

4

any Competing [Essendant] Transaction Agreement; or (v) resolve, propose or agree, or authorize or permit any Representative, to do any of the foregoing.[10]

In the same section, Essendant also agreed to terminate any discussions concerning competing transactions that had started prior to the execution of the Agreement. [11]

Notwithstanding Section 7.03(a), Section 7.03(c) allowed Essendant to provide information to and have discussions with any "Person (or any of such Person's representatives) who has made a written, bona fide proposal or offer with respect to a Competing [Essendant] Transaction that did not arise or result from any material breach of Section 7.03(a)."[12]  To achieve the protection of Section 7.03(c), Essendant's board was first required to determine "in its good faith judgment . . . that [the competing] proposal . . . constitutes, or is reasonably likely to lead to, a Superior Proposal[.]"[13]  A Superior Proposal is one the Essendant board:

---

[10] Compl., Ex. A ("Agreement") § 7.03(a). "Competing [Essendant] Transaction" includes "(i) any merger, consolidation, share exchange, business combination, recapitalization, liquidation, dissolution or other similar transaction involving [Essendant] or any of its Subsidiaries, the assets of which constitute or represent more than 20% of the total revenue or fair market value of the assets of [Essendant] and its Subsidiaries, taken as a whole . . . ." Agreement A-2.

[11] Agreement § 7.03(a) ("[Essendant] shall . . . immediately cease and cause to be terminated all existing discussions or negotiations with any Persons (other than GPC and its Affiliates) conducted prior to the execution of this Agreement . . . with respect to a Competing [Essendant] Transaction.").

[12] Agreement § 7.03(c) (the "Superior Proposal Provision").

[13] *Id.*

5

determines, in its good faith judgment, after consulting with a financial advisor of internationally recognized reputation and external legal counsel . . . to be (a) more favorable from a financial point of view, to the stockholders of [Essendant] than the Merger and (b) reasonably expected to be consummated.[14]

Under Section 9.01(g), Essendant was permitted to terminate the Agreement "to enter into a definitive agreement with respect to a Superior Proposal," but only "to the extent permitted by, and subject to the applicable terms and conditions of Section 7.03(d)(ii)" and only "provided that prior to or substantially concurrently with such termination, [Essendant] pays or causes to be paid to GPC the Termination Fee."[15] Section 7.03(d)(ii), in turn, allows for termination of the Agreement to pursue a Superior Proposal that "did not arise or result from any material breach" of the Non-Solicitation Provision.[16]

---

[14] Agreement A-14–A-15. Before entering discussions with another offeror, Essendant also agreed to notify GPC in writing at least three days before beginning any discussions with or providing any information to the competing offeror and to obtain from the competing offeror an "'Acceptable Confidentiality Agreement' (it being understood that an Acceptable Confidentiality Agreement and any related agreements shall not include any provision granting such Person exclusive rights to negotiate with [Essendant] or having the effect of prohibiting [Essendant] from satisfying its obligations under this Agreement)[.]" Agreement § 7.03(c). An "Acceptable Confidentiality Agreement" is one with terms "no less favorable to [Essendant] than those in the aggregate contained in the Confidentiality Agreement [with GPC]." Agreement A-1.

[15] Agreement § 9.01(g); *see also* Agreement A-13 ("'Termination Fee' means $12,000,000.").

[16] Agreement § 7.03(d)(ii).

In Section 9.02, the parties agreed "there shall be no liability . . . on the part of any Party" following a "valid termination" of the Agreement, except that the parties are not "relieve[d]" of liability for fraud or "Willful Breach[es]" committed prior to termination.[17]  As for the Termination Fee, Section 9.03(e) provides that payment of the fee is GPC's exclusive remedy for termination if Essendant pays the fee "in accordance with" Section 9.03:

> notwithstanding anything in this Agreement to the contrary (including Section 9.02), in the event that the Termination Fee is paid in accordance with this Section 9.03, the payment of the Termination Fee shall be the sole and exclusive remedy of GPC . . . and in no event will GPC or any other such Person seek to recover any other money damages or seek any other remedy based on a claim in law or equity . . . .[18]

## C. Sycamore Enters the Picture

Prior to executing the Agreement, Essendant assured GPC it had no interest in merging with anyone else and that no other entity was interested in a transaction with Essendant.[19]  But according to GPC, Sycamore, on behalf of Staples, had

---

[17] The Agreement defines "Willful Breach" as "a breach of, or failure to perform any of the covenants or other agreements contained in this Agreement, that is a consequence of an act or failure to act by the breaching party . . . with actual knowledge that such Person's act or failure to act would, or would reasonably be expected to, result in or constitute a breach of or failure of performance under the Agreement."  Agreement A-13.

[18] Agreement § 9.03(e).  The parties agree the version of the Agreement attached to the Complaint incorrectly identifies Section 9.03(e) as Section 9.03(h).

[19] Compl. ¶ 17.

expressed interest in acquiring Essendant on April 9, 2018, just three days before the execution of the Agreement.[20] Essendant's board addressed Sycamore's pre-signing overture in a meeting held the day before executing the Agreement but said nothing of it to GPC until May 31, 2018.[21]

On April 17, 2018, Sycamore formally offered to acquire Essendant's stock for $11.50 per share. After considering this initial proposal on April 24, 2018, Essendant's board determined the offer was unlikely to lead to a Superior Proposal as defined in the Agreement.[22] On April 25, Essendant filed its quarterly earnings release and 10-Q, neither of which mentioned Sycamore's proposal.[23] Two days later, on April 27, ten days after receiving it, Essendant informed GPC of Sycamore's proposal.[24]

To any outsider and to GPC, there were no signs that Essendant might terminate the Agreement. Indeed, a slide deck for Essendant's quarterly earnings

---

[20] Compl. ¶ 28.

[21] Compl. ¶¶ 28–29.

[22] Compl. ¶ 29.

[23] Compl. ¶ 31.

[24] Compl. ¶ 32.

call included a discussion of how the GPC transaction would "further enhance[]" Essendant's strategy."[25]

## D. Essendant Entertains Sycamore's Second Proposal

According to GPC, when Essendant rejected Sycamore's April 17 proposal, the Essendant board conveyed to Sycamore that it would be open to receiving a revised offer.[26] On April 29, Sycamore obliged and submitted a "renewed" proposal to acquire Essendant's stock for $11.50 per share—the same price per share it offered on April 17.[27] This time, however, Essendant's board concluded Sycamore's renewed offer was reasonably likely to lead to a Superior Proposal because Sycamore indicated it might make a higher bid upon receiving non-public information.[28] Essendant's board notified GPC of its determination on May 4.[29]

Three days later, on May 7, GPC advised Essendant that, in its view, Sycamore's second proposal did not constitute and would not lead to a Superior Proposal and warned Essendant that continued negotiations with Sycamore would

---

[25] Compl. ¶ 31.

[26] Compl. ¶ 33.

[27] Compl. ¶ 34.

[28] Compl. ¶ 35.

[29] Compl. ¶¶ 34–35.

violate the Agreement's Non-Solicitation Provision.[30]  As support for its position, GPC pointed to a preliminary discounted cash flow analysis that suggested implied share prices for Essendant resulting from the Sycamore proposal were significantly lower than the share prices expected to result from the SPR merger.[31]  GPC also observed that antitrust regulators were unlikely to approve a transaction with Sycamore because its proposal would be viewed as an attempt to protect Sycamore's investment in Staples against the impact of a merger between SPR and Essendant.[32]  Despite its objection to the Sycamore proposal, GPC concluded its response with an offer to pay Essendant's shareholders an additional $4 per share in the form of a contingent value right.[33]

While GPC's revised proposal was pending, Sycamore disclosed on a Schedule 13D, dated May 16, 2018, that it had acquired beneficial ownership of 9.9% of Essendant's outstanding shares.  By May 21, its stake had increased to 11.16%.[34]  According to GPC, Essendant and Sycamore's deliberate effort to conceal Sycamore's offers to the market allowed Sycamore to acquire a substantial

---

[30] Compl. ¶ 35.

[31] *Id.*

[32] *Id.*

[33] Compl. ¶ 36.

[34] Compl. ¶¶ 37–38.

10

position in Essendant from "unsuspecting shareholders who were not aware of the competing offer[s]."[35] This, coupled with the fact that Essendant did not require Sycamore to enter into an Acceptable Confidentiality Agreement per the Agreement (with a standstill provision),[36] allowed Sycamore to gain "an unfair advantage and materially increased the risk that Sycamore would be able to undermine Essendant's merger with SPR."[37]

### E. Essendant Terminates the Agreement

On May 31, 2018, Essendant revised a draft SEC Form S-4 to reflect its April 9 contact with Sycamore.[38] The next day, Essendant's board rejected GPC's proposed contingent value right.[39] After several additional months of negotiations with Sycamore, Essendant announced on September 10, 2018, that it had accepted Sycamore's bid, which had been increased to $12.80 per share.[40] Essendant's stock

---

[35] Compl. ¶ 41.

[36] Compl. ¶ 25.

[37] Compl. ¶¶ 38, 40.

[38] Compl. ¶¶ 4, 28.

[39] Compl. ¶ 36.

[40] Compl. ¶ 43.

price closed at $12.84 that day, down from $14.25 the day before.[41]  It continued to drop the following day, closing at $12.65 on September 11.[42]

Upon termination of the Agreement on September 14, 2018, Essendant paid, and GPC accepted, the $12 million Termination Fee.[43]  Essendant informed GPC that it had determined Sycamore's proposal was superior after discovering, among other information, documents from Essendant employees indicating that GPC was considered an Essendant competitor, thereby increasing the antitrust risks associated with the SPR merger.[44]  According to GPC, the parties expected these kinds of

---

[41] *Id.*

[42] *Id.*  One week after Essendant announced it had accepted Sycamore's proposal, Essendant's largest shareholder, Pzena Investment Management LLC ("PIM"), stated in a 13D filing that it intended to oppose the merger.  PIM maintained that Sycamore's offer of $12.80 per share was neither superior to GPC's offer nor an adequate valuation of Essendant independent of the GPC transaction.  *Id.*

[43] GPC, Annual Report (Form 10-K) at F-30 (Feb. 25, 2019) ("On September 14, 2018, the definitive agreement with Essendant was terminated by Essendant, so that Essendant could enter into a merger agreement with another party.  Concurrently with the termination, the Company received a termination fee of $12,000,000."); GPC, Quarterly Report (Form 10-Q) at 13–14 (Oct. 22, 2018) (same); Transmittal Aff. of Arthur R. Bookout ("Bookout Aff.") (D.I. 10), Ex. 5 at 21 (October 18, 2018 Q3 Earnings Call) ("Essendant's Board of Directors determined that the competing acquisition proposal from Staples was a superior proposal as defined in the merger agreement.  While we disagree with this determination, the SPR and Essendant merger agreement was terminated and GPC was paid a $12 million termination fee."); GPC, Current Report (Form 8-K) (Sept. 11, 2018) ("GPC anticipates that the Merger Agreement will terminate at the end of the three-day match period.  Upon termination of the Merger Agreement, Essendant will be required to pay a termination fee to GPC in the amount of $12 million.").

[44] Compl. ¶ 44.

documents to surface and anticipated the transaction would receive antitrust approval anyway, particularly given the positive feedback from customers and antitrust enforcement agencies.[45]

## F. Procedural Posture

GPC filed its Complaint on October 10, 2018, alleging breach of contract for Essendant's engagement in ongoing discussions with Sycamore, its termination of the Agreement based on an inferior proposal, its failure to require Sycamore to enter a confidentiality agreement with terms at least as restrictive as those in GPC's confidentiality agreement and, finally, its failure to exercise reasonable best efforts to close the merger with SPR. Defendant moved to dismiss on November 5, 2019, under Rule 12(b)(6), on grounds that the Termination Fee is the sole remedy under the Agreement and GPC has failed adequately to plead breach of contract.[46]

## II. ANALYSIS

In considering a motion to dismiss under Court of Chancery Rule 12(b)(6), the Court applies a well-settled standard:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are 'well-pleaded' if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate

---

[45] *Id.*

[46] D.I. 5.

unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[47]

Generally, the Court may address issues involving contract interpretation on a motion to dismiss "[w]hen the language of a contract is plain and unambiguous."[48] In this regard, the parties' disagreement as to the meaning or proper construction of contract provisions does not render the contract ambiguous.[49] Rather, ambiguity arises only "when the provisions in controversy are reasonably or fairly susceptible to different interpretations or may have two or more different meanings."[50]

## A. GPC Has Adequately Pled the Termination Fee Is Not the Exclusive Remedy for Termination

As is typical in disputes arising from complex integrated contracts, the parties' competing constructions of the Agreement beckon a whistle-stop tour through several of its interconnected provisions. Most important to Defendant's motion is Section 9.03(e), which provides, in part, "notwithstanding anything in this Agreement to the contrary (including Section 9.02), in the event the Termination Fee is paid *in accordance with* this Section 9.03, the payment of the Termination Fee

---

[47] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (citations omitted).

[48] *Capital Corp. v. GC Sun Hldgs., L.P.*, 910 A.2d 1020, 1030 (Del. Ch. 2006).

[49] *See NBC Universal, Inc. v. Paxson Commc'ns Corp.*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005).

[50] *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992) (internal citation omitted).

14

shall be the sole and exclusive remedy of GPC[.]"[51] Essendant terminated the Agreement under Section 9.01(g); therefore, it purported to pay the Termination Fee "in accordance with" Section 9.03(a)(ii).[52]

As noted, Section 9.03(a)(ii) contemplates termination of the Agreement "pursuant to" Section 9.01(g), meaning "in conformity with" that provision.[53] Section 9.01(g) permits Essendant to terminate the Agreement "to enter into a definitive agreement with respect to a Superior Proposal to the extent permitted by, and subject to the applicable terms and conditions of, Section 7.03(d)(ii)[.]"[54] Section 7.03(d)(ii), in turn, allows for termination under Section 9.01(g) if, "in response to the receipt of an offer or proposal with respect to a Competing [Essendant] Transaction that did not arise from any material breach of Section 7.03(a), the [Essendant] Board determines in its good faith judgment . . . that

---

[51] Agreement § 9.03(e) (emphasis supplied).

[52] Agreement § 9.03(a)(ii) ("If [Essendant] terminates this Agreement pursuant to Section 9.01(g), then, prior to or substantially concurrently with [Essendant's] notice of [] termination, [Essendant] shall pay or cause to be paid to GPC the Termination Fee in cash in immediately available funds[.]"). I note the phrase "in accordance with" can, and therefore must, be interpreted per its "ordinary meaning." *PharmAthene, Inc. v. SIGA Tech., Inc.*, 2008 WL 151855, at *12 (Del. Ch. Jan. 16, 2008). "In accordance with" means "in a way that agrees with or follows something, such as a rule or request." *In accordance with*, MERRIAM-WEBSTER (last visited Sept. 4, 2019), https://www.merriam-webster.com/dictionary/in%20accordance%20with.

[53] *Pursuant to*, MERRIAM-WEBSTER (last visited Sept. 4, 2019), https://www.merriam-webster.com/dictionary/pursuant%20to.

[54] Agreement § 9.01(g).

such offer or proposal constitutes a Superior Proposal[.]"[55]  Finally, Section 7.03(a)

contains the Non-Solicitation Provision.[56]

GPC argues that for Section 9.03(e)'s "sole and exclusive" language to apply,

Essendant must follow the contractually-sequenced path outlined above.  That is,

Essendant must pay the Termination Fee "in accordance with Section 9.03," which

requires terminating "pursuant to Section 9.01(g)," which entails meeting the

requirements of Section 7.03(d)(ii).[57]  Finally, GPC argues, Section 7.03(d)(ii)

allows for termination only in response to a competing transaction that: (i) did not

arise from a material breach of 7.03(a), and (ii) the Essendant board properly

determined to constitute a Superior Proposal.

Essendant argues GPC's construction attaches layers to Section 9.03(e)'s

exclusive remedy provision that are not justified by its clear and unambiguous terms.

By Essendant's lights, once GPC accepted the Termination Fee, it may not recover

beyond that fee because it has acknowledged the fee was paid "in accordance" with

Section 9.03 as required by Section 9.03(e).  In this regard, Essendant does not take

issue with GPC that Section 9.03(e) applies only to the extent Essendant has

---

[55] Agreement § 7.03(d)(ii).

[56] Agreement § 7.03(a).

[57] Agreement § 9.03(e).

complied with Section 9.03(a)(ii), Section 9.01(g) and its related provisions.[58]  But Essendant insists that GPC's acceptance of the Termination Fee precludes any argument that Essendant somehow failed to act "in accordance with" those provisions.

In support of its position, Essendant cites *Cirrus Holding Co. v. Cirrus Industries, Inc.*, where this court determined on a motion for preliminary injunction that a losing bidder was unlikely to get specific performance beyond the termination fee based on an argument that the target company breached a stock purchase agreement.[59]  The court rested its conclusion, in part, on "unusually stringent provisions making receipt of [the termination fee] exclusive of other legal or equitable remedies."[60]  As Essendant points out, the language of the exclusive remedy provision at issue in *Cirrus* (Section 11.5) was quite similar to Section 9.03(e) in the Agreement:

---

[58] Oral Arg. on Def.'s Mot. to Dismiss Tr. ("Tr.") 18:9–15 (Q: "[S]o you are then not necessarily disputing their construction that would say that the liability limiting provisions in 9.02 or 9.03[] apply only in circumstances where there has been compliance with 9.01(g)?  You're not disputing that?  A: Correct, Your Honor."; Tr. 19:1–8 ("So in 9.03(e) it says 'paid in accordance with this Section 9.03.'  That's it.  I'm not disputing that 'in accordance with' gets down to each of those levels, so we then get talking about whether each of those was met.  Just as you said, Your Honor, I'm saying that plaintiff has said, 'The termination was effective, the fee was owed, it was paid; therefore, we're done.'").

[59] 794 A.2d 1191 (Del. Ch. 2001).

[60] *Id.* at 1194.

> In the event the Cirrus Termination fee is paid to Purchaser pursuant to Section 11.3, such payment shall be the exclusive remedy at law of Purchaser, and Purchaser shall not be entitled to any further or other rights, claims or remedies at law all of which further rights, claims and remedies Purchaser irrevocably waives . . . .[61]

Where *Cirrus* departs from this case, however, is in the language of the provisions incorporated by reference in that agreement's termination fee provision. To terminate "pursuant to Section 11.3," the termination notice had to be effective under Section 11.1.7, which, in turn, was satisfied "if Cirrus consummates an Alternative Transaction."[62] That the language in Section 11.1.7 was otherwise unconditional was important to Vice Chancellor Lamb's decision. Indeed, the court rejected plaintiff's argument that the court "should read into Section 11.1.7 words to the effect that any Alternative Transaction that is the predicate for a notice of termination under that section *did not result from a breach of the SPA and, in particular, the lock-up provisions of Section 7.3.1*."[63]

In contrast to the language in Section 11.1.7, the Agreement's comparable provision, Section 9.01(g), provides that Essendant may terminate "to enter into a definitive agreement with respect to a Superior Proposal *to the extent permitted by*

---

[61] *Id.* at 1202.

[62] *Id.*

[63] *Id.* at 1204 (emphasis in original).

*and subject to the applicable terms and conditions of, Section 7.03(d)(ii)*[.]"[64] In other words, Section 9.01(g) contains, in essence, the condition that *Cirrus* found was missing in the comparable provision at issue there. Thus, while Section 9.03(e) appears at first glance to dictate the same result as in *Cirrus*, a comparison of the related provisions makes clear that, unlike in *Cirrus*, there is room in Section 9.03(e) for GPC to argue that the exclusive remedy provision does not apply because: (i) there was no Superior Proposal;[65] and, if there was one, (ii) it resulted from a material breach of the Agreement.[66] This is the only reasonable construction of the operative terms of the Agreement.

## B. GPC Has Not Waived Its Breach of Contract Claim

Notwithstanding the language of the Agreement, Essendant argues GPC has agreed the termination was valid based primarily on GPC's public statements and SEC filings near the time of the termination.[67] GPC responds that Essendant's payment of the Termination Fee reflects, at best, Essendant's belief in its position that the termination was valid. On the other hand, GPC's acceptance of the fee to

---

[64] Agreement § 9.01(g) (emphasis supplied).

[65] *Id.*

[66] Agreement § 7.03(d)(ii).

[67] GPC, Annual Report (Form 10-K) at F-30 (Feb. 25, 2019); GPC, Quarterly Report (Form 10-Q) at 13–14 (Oct. 22, 2018); Bookout Aff., Ex. 5 at 21; GPC, Current Report (Form 8-K) (Sept. 11, 2018).

which it is unquestionably entitled is nothing more than that—acceptance of a payment owed without waiver of its claim that more is owed. On this point, GPC cites to *NACCO Industries, Inc. v. Applica Inc.*, where a losing bidder placed its termination fee in escrow and then brought claims against the target for breach of the merger agreement.[68] The court found the plaintiff's acceptance of the termination fee did not preclude its breach of contract claims but may limit plaintiff's future recovery:

> [i]n terms of any reliance-based recovery, [plaintiff] will have to contend with its receipt of a bargained-for $4 million termination fee and $2 million in expense reimbursement. But as is customary in merger agreements, [defendant's] right to terminate the [merger agreement] . . . and pay the fees without further liability depended on [defendant] complying with its obligations . . . including the No-Shop and Prompt Notice Clauses . . . . It is far from clear at this stage that NACCO is bound contractually or factually to the termination fee and expense reimbursement as a measure of recovery.[69]

While it is true the parties in *NACCO* had not agreed to an exclusive remedy provision in their merger agreement, I have determined Section 9.03(e) (the exclusive remedy provision) requires compliance with Section 9.03(a)(ii) and Section 7.03(d)(ii) (describing the circumstances where Essendant could accept a Superior Proposal), which, in turn, requires compliance with 7.03(a) (the Non-

---

[68] *NACCO Indus., Inc. v. Applica Inc.*, 997 A.2d. 1 (Del. Ch. 2009).

[69] *Id.* at 19.

Solicitation Provision). With this in mind, I find *NACCO*'s observations with respect to the forsaken bidder's right to pursue recovery beyond the termination fee instructive.

As in *NACCO*, I see no basis to conclude that GPC's acceptance of the Termination Fee precludes it from pursuing breach of contract claims as a matter of law.[70] Essendant does not cite any provision of the Agreement that prevents GPC from both accepting the Termination Fee and pursuing its breach of contract claims. On the contrary, Essendant concedes that Section 9.03(e) does not apply if the Termination Fee was not paid "in accordance with Section 9.03." As discussed above, GPC has well-pled the chain of provisions, beginning with Section 9.03(a)(ii), that provide a path to argue Essendant's material breach of the Non-Solicitation Provision and its failure to comply with the Superior Proposal Provision amount to failures to pay the fee in accordance with Section 9.03. As Vice Chancellor Laster noted in *NACCO*, GPC's acceptance of the Termination Fee may present factual and legal issues for its damages claim,[71] but at this stage, GPC has adequately pled facts that allow a reasonable inference that GPC's acceptance of the

---

[70] *Id.*

[71] *Id.*

21

Termination Fee does not prevent it from pursuing damages caused by Essendant's termination after an alleged breach of contract.

## C. GPC States a Claim for Breach of Contract

Having determined that Essendant's payment, and GPC's acceptance, of the Termination Fee does not prohibit GPC from recovering on its breach claim, I turn to whether GPC has adequately pled a claim for material breach of Section 7.03(a) of the Agreement.[72]  For reasons explained below, I find that it has.

"A 'material breach' is a failure to do something that is so fundamental to a contract that the failure to perform that obligation defeats the essential purpose of the contract or makes it impossible for the other party to perform under the contract."[73]  According to Essendant, GPC has not alleged Essendant failed to do something so fundamental to the Agreement that it defeated the purpose of the Agreement.  I disagree.  It is reasonable to infer that a fundamental purpose of the Agreement, from GPC's perspective, was lawfully to secure GPC's exclusive ability to merge with Essendant.  Indeed, GPC alleges Essendant's representations that it

---

[72] GPC has also alleged that Essendant breached the Superior Proposal Provision and the reasonable best efforts provision and failed to execute an Acceptable Confidentiality Agreement with Sycamore.  Because I find GPC has adequately pled a material breach of the Non-Solicitation Provision, I need not and do not address Plaintiff's remaining allegations of breach at this stage.

[73] *eCommerce Indus., Inc. v. MWA Intelligence, Inc.*, 2013 WL 5621678, at *13 (Del. Ch. Sept. 30, 2013).

22

had no interest in a merger partner other than SPR and that no other party was interested in a transaction with Essendant were critical to GPC's decision to move forward with the merger.[74] The Non-Solicitation Provision, which is broadly worded to prohibit Essendant from "directly or indirectly" soliciting, would conceivably be material to achieving that purpose.[75]

Essendant correctly points out that its board had a duty "to secure the best value reasonably available to stockholders."[76] "As part of this duty, directors cannot be precluded by the terms of an overly restrictive 'no-shop' provision from all consideration of possible better transactions."[77] But no-shop provisions "are common in merger agreements and do not imply some automatic breach of fiduciary duty."[78] And Essendant does not argue the Non-Solicitation Provision at

---

[74] Compl. ¶ 17.

[75] *Eagle Force Hldgs., LLC v. Campbell*, 2018 WL 2351326, at \*16 (Del. May 24, 2018) ("What [contract] terms are material is determined on a case-by-case basis, depending on the subject matter of the agreement and on the contemporaneous evidence of what terms the parties considered essential."). *See also Matthew v. Laudamiel*, 2012 WL 2580572, at \*10 (Del. Ch. June 29, 2012) (noting that issues of "materiality" in the breach of contract context raise "predominantly questions of fact" that are not appropriate for summary disposition) (citing *Branson v. Exide Elecs. Corp.*, 645 A.2d 568 (Del. 1994)).

[76] *Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 37 (Del. 1994).

[77] *Cirrus*, 794 A.2d at 1207.

[78] *In re IXC Commc'ns, Inc. v. Cincinnati Bell, Inc.*, 1999 WL 1009174, at \*6 (Del. Ch. Oct. 27, 1999).

issue here is overly restrictive. Nor could it, as Section 7.03(c) acknowledges and preserves the board's fiduciary obligations by expressly allowing the board to enter discussions regarding a competing transaction as long as the transaction "did not arise or result from a material breach of Section 7.03(a)."[79] Nothing about this provision suggests that it is unenforceable as a matter of Delaware fiduciary law.

I turn next to whether GPC has adequately alleged facts that support a reasonably conceivable claim of breach of the Non-Solicitation Provision. According to GPC, it has pled facts from which the Court may reasonably infer "a wrongful and furtive pattern of contacts and cooperation that breached and undermined the entire Merger Agreement," including the occurrence of post-signing discussions in which Essendant conveyed to Sycamore that a revised offer would be accepted:[80]

- Sycamore's pre-Agreement execution call on April 9;

- the Essendant board's discussion of the call on April 11;

- Sycamore's subsequent offer on April 17;

- Essendant's "quiet rejection" of the first offer on April 24;

- Sycamore's "revised offer" on April 29 that was allegedly equivalent to Sycamore's first offer but suddenly was deemed likely to lead to a Superior Proposal;

---

[79] Agreement § 7.03(c).

[80] PAB at 27 n.8 (citing *NACCO*, 997 A.2d at 17).

24

- Essendant's delay in informing GPC of the April 9 call until May 31;

- Sycamore's permissive confidentiality agreement that was not signed until three months after Sycamore's revised offer.[81]

Essendant argues that none of these facts support GPC's allegation that Essendant conveyed to Sycamore that it would consider a revised offer. Rather, Essendant notes a rejection of an offer always implies that, if a better offer follows, then it will be considered. Thus, an explicit statement to that effect from the board would no more breach the Non-Solicitation Provision than would a statement, "Wednesday follows Tuesday."[82] In other words, even if the board's rejection of Sycamore's April 17 offer came with an explicit statement that a better offer would be considered, no material breach occurred because the board provided no new information to the mix. If, on the other hand, Essendant's board informed Sycamore that a cash deal was preferred to a stock deal, for example, and Sycamore used that information to enhance its second proposal, then a material breach would have occurred. Essendant also points out that GPC has failed to allege any facts that would support an inference that Essendant favored a deal with Sycamore over one with GPC.[83]

---

[81] PAB at 34. *See also* Compl. ¶¶ 33–34, 38, 43, 48.

[82] Tr. 23.

[83] *See NACCO*, 997 A.2d at 17 (noting that the target's "senior management feared they would lose their jobs following a strategic deal [with NACCO]").

I agree with Essendant that none of GPC's allegations, standing alone, would support a claim that Essendant breached the Non-Solicitation Provision. Taking a cue from the court in *NACCO*,[84] however, I am satisfied GPC has adequately alleged enough in total from which I can infer that Essendant, at least indirectly, encouraged or facilitated a proposal with respect to a competing transaction.

Essendant engaged with Sycamore before executing the Agreement and then received a call from Sycamore with a proposal soon after. Thus, Sycamore was not a pop-up bidder that the Essendant board was required to engage with post-signing. It had expressed its interest in acquiring Essendant to Essendant's board before the board committed to GPC. The Non-Solicitation Provision specifically requires Essendant to "immediately cease and cause to be terminated all existing discussions or negotiations with any [p]ersons . . . with respect to a Competing [Essendant] transaction."[85] GPC alleges that, in violation of this obligation, "Essendant conveyed to Sycamore that it would be open to receiving a revised offer from Sycamore" after it signed up with GPC.[86] Whether this statement—that the

---

[84] *See NACCO*, 997 A.2d at 17 ("I recognize that each of the allegations in the Complaint, when viewed separately and in isolation, can be minimized . . . . My task at the pleadings stage, however, is not to weigh competing inferences but rather to draw reasonable inferences in favor of the plaintiff.").

[85] Agreement § 7.03(a)(v).

[86] Compl. ¶ 33.

26

Essendant board would be open to receiving a revised offer—proves factually to be accurate or whether it contextually represents a direct or indirect solicitation of a proposal, remains to be seen.[87]  For now, the allegation supports a pleading stage inference of breach of Section 7.03(a).[88]

An even stronger circumstantial inference of breach arises from the pled fact that Essendant rejected Sycamore's first proposal only to deem essentially the same offer a Superior Proposal shortly after.[89]  GPC has alleged the only distinction between the proposals was Sycamore's suggestion that it would increase its offer upon review of Essendant's non-public information.  This allegation, in turn, implicates GPC's allegations that Essendant breached the Agreement by providing Sycamore access to confidential information on terms that were less "restrictive [than] those contained in the confidentiality agreement between Essendant and GPC."[90]  These allegations allow a reasonable inference that Essendant's board "directly or indirectly" shared its preferences or inclinations with Sycamore, thereby

---

[87] Tr. 23.

[88] *Savor*, 812 A.2d at 896–97; Compl. ¶ 1 (alleging that Essendant "encouraged . . . an inferior bid from Staples").

[89] Compl. ¶¶ 34–35.

[90] Compl. ¶ 40.

27

encouraging it to resubmit its offer with a slight alteration so the board could "properly" begin competing negotiations.[91]

### III.  CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is DENIED.

**IT IS SO ORDERED.**

---

[91] Agreement § 7.03(c); Pl.'s Answering. Br. in Opp'n to Def.'s Mot. to Dismiss at 43 (D.I. 15).