**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| U.S. LEGAL SUPPORT, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2021-0289-MTZ |
| | ) | |
| PAUL LUCIDO AND STENO, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING IN PART U.S. LEGAL SUPPORT, INC.'S
MOTION FOR PRELIMINARY INJUNCTION**

WHEREAS, on review of Plaintiff's amended motion for preliminary injunction (the "Motion"), as briefed and taken under advisement on September 24, 2021, it appears:[1]

A.    Plaintiff U.S. Legal Support, Inc. ("U.S. Legal" or "Plaintiff") is a Texas corporation and a wholly-owned subsidiary of U.S. Legal Support Investment Holdings, LLC, a Delaware limited liability company.[2]  U.S. Legal is a litigation

---

[1] Citations in the form of "Pl.'s Ex. —" refer to the exhibits attached to the Transmittal Declaration of Andrew L. Cole Pursuant to 10 *Del. C.* § 3927 in Support of Plaintiff U.S. Legal Support Inc.'s Opening Brief in Support of Motion for Preliminary Injunction, available at Docket Item ("D.I.") 145, and the Transmittal Declaration of Andrew L. Cole Pursuant to 10 *Del. C.* § 3927 in Support of Plaintiff U.S. Legal Support Inc.'s Reply Brief in Support of Motion for Preliminary Injunction, available at D.I. 167.  Citations in the form of "Defs.' Ex. —" refer to the exhibits attached to the Transmittal Declaration of James H. S. Levine, Esq. in Support of Defendants' Answering Brief in Opposition to Plaintiff's Amended Motion for a Preliminary Injunction, available at D.I. 151 through D.I. 163.  Citations in the form of "Hr'g Tr. —" refer to the Transcript of the September 24, 2021 Hearing on Plaintiff's Motion for a Preliminary Injunction, available at D.I. 175.

[2] D.I. 1 ¶ 8 [hereinafter "Compl."].

support services business that provides court reporting, record retrieval, and interpreting, translation, trial, and transcription services for law firms, major corporations, and insurance companies nationwide.[3]

B.     Defendant Paul Lucido is an individual who resides in Florida.[4]  He worked for U.S. Legal as an account executive from 2008 or 2009 until his resignation on April 2, 2021 as U.S. Legal's Director of Business Development and "top grossing salesperson."[5]  On March 18, 2021, he signed an employment agreement and other related agreements with defendant Steno Agency, Inc. ("Steno," and together with Lucido, "Defendants").[6]  Steno is a court reporting start-up company, incorporated in Delaware with its principal place of business in California.[7]

C.     During his tenure with U.S. Legal, Lucido entered several agreements with U.S. Legal including a compensation assurance agreement, three different stock

---

[3] *Id.*

[4] *Id.* ¶ 9.

[5] *Id.* ¶¶ 1, 18–19, 53; D.I. 77 ¶ 18 [hereinafter "Answer"]; D.I. 150, Affidavit of Paul Lucido in Support of Defendants' Answering Brief in Opposition to Plaintiff's Amended Motion for Preliminary Injunction ¶ 2 [hereinafter "Lucido Aff."].

[6] Compl. ¶ 52; Answer ¶ 52; D.I. 145, Excerpts from Paul Lucido, Dave Kaufman and Raquel Rivera Depositions to Transmittal Declaration of Andrew L. Cole Pursuant to 10 *Del. C.* § 3927 in Support of Plaintiff U.S. Legal Support, Inc.'s Opening Brief in Support of Motion for Preliminary Injunction at 18:18–24 [hereinafter "Lucido Dep."].  The caption in this matter misidentifies Steno Agency, Inc. as "Steno, Inc."  Answer at 1.

[7] Compl. ¶ 10.

option contracts, a shareholders' agreement, a stock purchase agreement, and an LLC agreement.[8] U.S. Legal seeks a preliminary injunction enforcing the restrictive covenants Lucido agreed upon; the scope of those covenants is disputed.

1. Lucido and Plaintiff entered into stock option agreements in 2012, 2013, and 2015, each titled "U.S. Legal Support, Inc. Employee Award and Noncompetition Agreement (Nonqualified Stock Option)" (each a "Stock Option Agreement").[9] Each Stock Option Agreement contains a set of restrictive covenants prohibiting Lucido from soliciting business or employees from, or competing with, U.S. Legal.[10]

2. In 2014, Lucido and U.S. Legal entered into an Amended and Restated Voting and Shareholders' Agreement (the "Shareholders' Agreement") that contains covenants prohibiting dissemination of U.S. Legal's confidential information, competition with U.S. Legal, and solicitation of U.S. Legal business.[11]

3. U.S. Legal stockholders, including Lucido, sold their interests to U.S. Legal's now-parent company via a Stock Purchase Agreement dated

---

[8] *Id.* ¶¶ 35–45; D.I. 16, Affidavit of Peter J. Giammanco in Support of Plaintiff U.S. Legal Support, Inc.'s Amended Motion for Temporary Restraining Order with Certificate of Service, Exhibit A; Defs.' Ex. 15; Compl. Ex. B; *id.* Ex. C; *id.* Ex. D; *id.* Ex. E; *id.* Ex. F; *id.* Ex. G.

[9] Compl. ¶¶ 36–40; *id.* Ex. B; *id.* Ex. C; *id.* Ex. E.

[10] Compl. ¶¶ 36–37, 39; *id.* Ex. B § 11; *id.* Ex. C § 11; *id.* Ex. E § 11.

[11] Compl. ¶ 38; *id.* Ex. D §§ 3.01–3.03 [hereinafter "Shareholders' Agr."].

November 30, 2018 (the "SPA").[12] The SPA provides that for a period of five years, Lucido would not directly or indirectly compete with or solicit employees, customers, or prospective customers from U.S. Legal.[13] In connection with this transaction, Lucido also entered into an Amended and Restated Operating Agreement dated November 30, 2018 (the "LLC Agreement") agreeing not to disclose U.S. Legal's confidential information and not to "take commercial or proprietary advantage of or profit from any Confidential Information or disclose Confidential Information" for as long as Lucido holds an interest, and for five years thereafter.[14]

D.     One of the first agreements Lucido signed with U.S. Legal was the 2012 Stock Option Agreement.[15] When U.S. Legal sent it to Lucido for his signature, Lucido expressed some concern about his option-based compensation structure and the restrictive covenants, based on his previous employment experience.[16] Lucido met with U.S. Legal's CEO, Charles Schugart, to discuss these issues.[17] To assuage Lucido's concerns, Schugart and Lucido entered into a Compensation Assurance

---

[12] Compl. ¶ 41; *id.* Ex. F.

[13] *Id.* § 5.4.

[14] Compl. ¶ 45; *id.* Ex. G § 6.8 [hereinafter "LLC Agr."].

[15] Lucido Aff. ¶ 9; Compl. Ex. B [hereinafter "2012 Stock Option Agr."].

[16] Lucido Aff. ¶¶ 9–14.

[17] Defs.' Ex. 13; Defs.' Ex. 14; Defs.' Ex. 15; Lucido Aff. ¶¶ 11–15; Lucido Dep. 28.

Agreement (the "CAA") agreeing in relevant part:

> If your annual commissionable revenue is $3 million or more and we reduce your base salary, change the methodology for calculating your commissions and/or the commission percentages in the following year, you will no longer be subject to any non-competition agreements governing your conduct should you then leave the Company.[18]

The same would be true if Lucido maintained his commissionable revenue and U.S. Legal terminated Lucido's employment for any reason other than "cause."[19] The CAA is a two-page letter. It appears undisputed that the CAA bound U.S. Legal and survived the SPA.[20]

E.     Effective January 1, 2021, Lucido's compensation structure changed via a 2021 Sales Incentive Compensation Plan ("SCIP").[21] It is undisputed that the 2021 SCIP triggered the CAA.[22]

F.     Lucido occasionally forwarded himself emails or attachments from his

---

[18] Lucido Aff. ¶¶ 14–15; Answer at 29; Defs.' Ex. 14; Defs.' Ex. 15 [hereinafter "CAA"].

[19] *See generally* CAA.

[20] Lucido Aff. ¶ 20 ("The only thing I knew was that the [CAA]- which I understood to excuse competition and solicitation – survived."); Defs.' Ex. 17 ("Paul – per our review with our legal team, we believe this compensation agreement survives a transaction and remains in effect post closing."); Defs.' Ex. 18, Smith Dep. at 76 ("Q: Okay. I believe that you testified about this before. But you said you're not aware of any facts that would change the analysis that you communicated to Paul [Lucido] on November 21st of 2018 which is that the [CAA] survives, a transaction remains in effect post closing; correct? A: That is correct.").

[21] Lucido Aff. ¶ 27; Defs.' Ex. 118.

[22] Hr'g Tr. 18, 19, 23.

U.S. Legal account to his personal Yahoo! account.[23]  For example, on September 18, 2020, Lucido emailed himself a copy of a spreadsheet listing all of his U.S. Legal clients.[24]  On October 5, Lucido sent himself a 630-page PDF listing law firms, contact persons, billing rates, and case names from U.S. Legal depositions.[25]  On October 21, Lucido blind-copied his personal email address when forwarding October schedules of various U.S. Legal jobs detailing job types, job numbers, start times, and case names.[26]  On November 4, Lucido forwarded to his personal email account a spreadsheet titled "Lucido Backup.xlsx," which listed hundreds of depositions over several months in 2020 and corresponding client contact information.[27]  On February 10, 2021, Lucido forwarded his year-over-year report to his personal email address.[28]  This report included client names and revenue summaries.[29]  And after Lucido entered an employment agreement with Steno, but before he resigned from U.S. Legal, Lucido forwarded an email from a client contact

---

[23] Compl. ¶ 73.  *See, e.g.*, Defs.' Ex. 24; Defs.' Ex. 26; Defs.' Ex. 32; Defs.' Ex. 33; Defs.' Ex. 34; Defs.' Ex. 42; Defs.' Ex. 43; Defs.' Ex. 45; Defs.' Ex. 47; Defs.' Ex. 49; Defs.' Ex. 50; Defs.' Ex. 51.

[24] Pl.'s Ex. 2; Pl.'s Ex. 3; D.I. 146, Affidavit of Carrie Cosenza in Support of Plaintiff U.S. Legal Support, Inc.'s Opening Brief in Support of Motion for Preliminary Injunction ¶ 4 [hereinafter Cosenza Aff.].

[25] Compl. ¶¶ 50–51, 56; *id.* Ex. H; Pl.'s Ex. 7; Pl.'s Ex. 8; Defs.' Ex. 45.

[26] Pl.'s Ex. 9.

[27] Pl.'s Ex. 6.

[28] Pl.'s Ex. 42.

[29] *Id.*

at Wilson Elser to his personal account.[30]

G.    On April 2, after resigning from U.S. Legal, Lucido emailed individuals at Steno regarding a potential client.[31]  In the weeks after his resignation, Lucido communicated with other U.S. Legal clients or forwarded their contact information to Steno colleagues.[32]  U.S. Legal identified thirteen clients whom Lucido contacted.[33]  Of those, seven have not booked any depositions with either Steno or U.S. Legal,[34] and only three booked depositions with Steno.[35]  After Lucido left U.S. Legal, Wilson Elser sent Lucido an "opportunity to bid" on a "potential large assignment."[36]  Once Lucido worked for Steno, Wilson Elser sent Steno employees an email on which Lucido was copied.[37]

---

[30] Pl.'s Ex. 4; Pl.'s Ex. 11; *see also* Pl.'s Ex. 10.

[31] Compl. ¶ 54; Compl. Ex. K.

[32] Pl.'s Ex. 4; Pl.'s Ex. 15; Pl.'s Ex. 16; Pl.'s Ex. 17; Pl.'s Ex. 18; Pl.'s Ex. 19; Pl.'s Ex. 20; Pl.'s Ex. 21; Pl.'s Ex. 22; Pl.'s Ex. 23; Pl.'s Ex. 24; Pl.'s Ex. 25; Pl.'s Ex. 26; Pl.'s Ex. 27; Pl.'s Ex. 28; Pl.'s Ex. 29.

[33] *See* Defs.' Ex. 137 at Interrog. No. 55; Cosenza Aff. ¶ 11.

[34] D.I. 150, Affidavit of Gregory Hong in Support of Defendants' Answering Brief in Opposition to Plaintiff's Amended Motion for Preliminary Injunction ¶¶ 12–14 [hereinafter "Hong Aff."].

[35] *Id.* ¶¶ 10–16; Defs.' Ex. 138, Affidavit of Michael Swimmer.

[36] Lucido Dep. 163:1–2.

[37] Defs.' Ex. 146 at 34 [hereinafter "Rivera Dep."] ("Q:  I want to go back briefly to the case of 157 West 57th Street – should say the 157 West 57th Street litigation.  To your knowledge, was that matter brought in by Paul Lucido for Steno?  A:  He was cc'd on the e-mail.  Q: Was Mr. Lucido the primary point of contact for that case at one point?  A:  I believe only for that e-mail."); *id.* 34–35 ("Q.  So you only recall one e-mail on the 157 West 57th Street litigation that involved Mr. Lucido?  A:  That is correct.").

H.    U.S. Legal sent Lucido a letter dated April 3 "reminding him of his obligations to collect and preserve evidence for this case, and not to use confidential information belonging to U.S. Legal Support."[38]  That same day, Steno asked Lucido to sign its Intellectual Property & Trade Secret Restrictions Policy, "which explicitly sets forth that it is against Steno's policies to use or disclose confidential information from another company in the performance of any job duties."[39]

I.    On April 5, U.S. Legal filed its Verified Complaint for Injunctive Relief (the "Complaint") alleging: (i) breach of contract against Lucido; (ii) misappropriation of confidential information and trade secrets in violation of the Delaware Uniform Trade Secrets Act against Lucido; (iii) breach of fiduciary duty against Lucido; (iv) tortious interference against Steno; (v) tortious interference with prospective business advantage against both Defendants; and (vi) aiding and abetting breaches of fiduciary duty against Steno.[40]  U.S. Legal simultaneously filed motions for a temporary restraining order, preliminary injunction, and expedited proceedings.[41]  It filed an amended motion for temporary restraining order (the

---

[38] Compl. ¶ 57; Answer ¶ 57.

[39] D.I. 23, Declaration Of Gregory H[o]ng In Support Of Answering Brief In Opposition To Plaintiff's Motion For Temporary Restraining Order ¶ 5 [hereinafter "Hong TRO Aff."]; *id.* Ex. 4; Hong Aff. ¶ 5.

[40] Compl. ¶¶ 63–107.

[41] D.I. 2; D.I. 3; D.I. 4.

"TRO") on April 8.[42]  After an April 21 hearing, I granted the TRO.[43]

J.      On August 16, U.S. Legal filed the Motion, requesting that Lucido be enjoined from soliciting specified clients (the "Preliminary Injunction List").[44]  The parties fully briefed the Motion, and I heard argument on September 24.[45]

K.      To obtain a preliminary injunction, the movant must demonstrate (i) a reasonable probability of success on the merits; (ii) a threat of irreparable injury if an injunction is not granted; and (iii) that the balance of the equities favors the issuance of an injunction.[46]  "This Court has broad discretion to grant or deny a preliminary injunction."[47]  But a preliminary injunction "is not granted lightly," and "the moving party bears a considerable burden in establishing each of these necessary elements.  Nevertheless, while some showing is required as to each

---

[42] D.I. 14.

[43] D.I. 61; D.I. 65.

[44] D.I. 142; Cosenza Aff. Ex. A.

[45] D.I. 143; D.I. 150; D.I. 166; D.I. 173; D.I. 175.

[46] *Pell v. Kill*, 135 A.3d 764, 783 (Del. Ch. 2016) (citing *Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173, 179 (Del. 1986)); *see also Ivanhoe P'rs v. Newmont Mining Corp.*, 535 A.2d 1334, 1341 (Del. 1987).

[47] *Fletcher Int'l, Ltd. v. ION Geophysical Corp.*, 2010 WL 1223782, at *3 (Del. Ch. Mar. 24, 2010) (citing *Data Gen. Corp. v. Digit. Comput. Controls, Inc.,* 297 A.2d 437, 439 (Del. 1972)).

element, there is no steadfast formula for the relative weight each of these three factors deserves."[48]

**IT IS ORDERED**, this 22nd day of October, 2021, that:

1.  The Motion is **GRANTED IN PART**. U.S. Legal has made the required showing on its claims for misappropriation of trade secrets and breach of nondisclosure covenants, but failed to make that showing on its claims that Lucido improperly competed with or solicited from U.S. Legal, and on its claims against Steno.

### Reasonable Likelihood Of Success On The Merits

2.  The first element of the familiar injunction test requires the plaintiff to establish a reasonable probability of success on the merits. This standard "falls well short of that which would be required to secure final relief following trial, since it explicitly requires only that the record establish a reasonable probability that this greater showing will ultimately be made."[49]

---

[48] *Id.* (alterations and internal quotation marks omitted) (quoting *La. Mun. Police Empls.' Ret. Sys. v. Crawford,* 918 A.2d 1172, 1185 (Del. Ch. 2007), and then quoting *Alpha Builders, Inc. v. Sullivan,* 2004 WL 2694917, at *3 (Del. Ch. Nov. 5, 2004)).

[49] *Pell*, 135 A.3d at 783 (quoting *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 579 (Del. Ch. 1998)).

*U.S. Legal Has Not Shown A Reasonable Likelihood Of Success
On Its Noncompetition And Nonsolicitation Claims.*

3.      Under the CAA, Lucido is "no longer [] subject to any non-competition agreements governing [his] conduct" after he left U.S. Legal.[50]  The parties dispute the scope of the clause, "any non-competition agreements":  specifically, whether it is limited to noncompete covenants, or whether it also includes nonsolicit covenants.

4.      The Court is tasked with interpreting the CAA's text to determine what the parties intended.[51]   "Delaware adheres to the objective theory of contracts, [meaning that] a contract's construction should be that which would be understood by an objective, reasonable third party."[52]  The Court will "give effect to the plain-meaning of the contract's terms and provisions,"[53] "will read a contract as a whole[,] and . . . will give each provision and term effect, so as not to render any part of the contract mere surplusage."[54]  "Unless there is ambiguity, Delaware courts interpret

---

[50] CAA ¶ 3.

[51] *See Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 846 (Del. 2019).

[52] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (internal quotation marks omitted) (quoting *NBC Universal v. Paxson Commc'ns*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005)).

[53] *Id.* at 1159–60.

[54] *Id.* at 1159 (quoting *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396–97 (Del. 2010)).

contract terms according to their plain, ordinary meaning," without resorting to extrinsic evidence.[55]

5. "When a contract's plain meaning, in the context of the overall structure of the contract, is susceptible to more than one reasonable interpretation, courts may consider extrinsic evidence to resolve the ambiguity."[56] "The extrinsic evidence the court may consider in such a circumstance includes 'overt statements and acts of the parties, the business context, prior dealings between the parties, business custom and usage in the industry.'"[57]

6. U.S. Legal asserts the CAA is unambiguous and by its terms, applies only to noncompete provisions, not other restrictive covenants like nonsolicitation, confidentiality, and nondisparagement clauses. Defendants argue the phrase "any non-competition agreements" is "fairly susceptible to different interpretations" and therefore ambiguous.[58] For example, the Court could interpret the term "narrowly to refer specifically to 'non-competition *clauses*' or 'non-competition *sections*' within agreements, such that . . . Lucido could compete with [U.S. Legal] but not

---

[55] *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012).

[56] *Salamone v. Gorman*, 106 A.3d 354, 374 (Del. 2014).

[57] *Comrie v. Enterasys Networks, Inc.*, 837 A.2d 1, 13 (Del. Ch. 2003) (quoting *Supermex Trading Co., Ltd. v. Strategic Sols. Gp.*, 1998 WL 229530, at *3 (Del. Ch. May 1, 1998)); *In re Mobilactive Media, LLC*, 2013 WL 297950, at *15 (Del. Ch. Jan. 25, 2013) (same).

[58] D.I. 150 at 30; Hr'g Tr. 19.

solicit [its] clients."[59]   Alternatively, "any non-competition agreements" could be understood broadly, to "refer to any restrictive covenants in agreements that have the effect of restricting [Lucido's] right to compete with [U.S. Legal], including by soliciting clients."[60]

7.    I agree with Defendants:  the CAA's use of the term "any non-competition agreements" is fairly susceptible to two different, yet reasonable, interpretations.   "[A]ny non-competition agreements" could be reasonably interpreted to mean any noncompetition agreement in a categorical sense, such as the 2012 Option Contract, which is titled as a "Noncompetition Agreement" but contains restrictive covenants prohibiting both competition and solicitation. Or it could be reasonably interpreted in a specific sense, such as the 2012 Option Contract's noncompete provision at Section 11(a) as distinguished from the nonsolicitation covenant at Section 11(b).[61]   I note that in contrast to the other agreements between Plaintiff and Lucido, the CAA is short and informal.  While the

_____

[59] D.I. 150 at 30.

[60] *Id.* at 30–31.

[61] *See, e.g.*, 2012 Stock Option Agr. *Compare* 2012 Stock Option Agr. at 1 ("U.S. Legal Support, Inc. Employee Award and Noncompetition Agreement (Nonqualified Stock Option)"), *with* 2012 Stock Option Agr. at § 11 (containing both noncompetition and nonsolicitation restrictive covenants).

13

CAA defines "cause," it does not define "non-competition agreements."[62] I conclude the CAA's term "any non-competition agreements" is ambiguous.

8. I may consider extrinsic evidence to resolve the ambiguity and "uphold, to the extent possible, the reasonable shared expectations of the parties at the time of contracting."[63] Here, Defendants have offered extrinsic evidence in support of their interpretation of the CAA: both Lucido and Schugart read the CAA to release Lucido from nonsolicitation obligations, such as those in the 2012 Option Contract that inspired the CAA.[64] U.S. Legal has not submitted any evidence supporting its

---

[62] *Compare* CAA ¶ 2, *with* CAA ¶ 3.

[63] *Comrie*, 837 A.2d at 13 (citing *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997))).

[64] Lucido explained in his affidavit:

> 13. At that meeting in New York, Schugart reassured me that he would use the fact he was giving me stock in [U.S. Legal] to reduce my cash compensation, or otherwise he would not restrict my ability to work for a competitor and take my business with me. I specifically remember Schugart telling me that, as long as I kept my commissionable revenue at $3M, then, if [U.S. Legal] ever changed my compensation or commission structure, Schugart would "let me free." Given our discussions, I understood this to mean "free" of the restrictive covenants in the Noncompetition Agreement that was sent to me. Otherwise, I would not really be "free."

> 14. I signed the Noncompetition Agreement in October of 2012. Subsequently, Schugart had his attorney draft an agreement for me to sign. The first version of the letter was sent to me in early November of 2012. Prior to signing it, I asked a friend Howard Balsam (who is an attorney) to review the document for me. He suggested adding in "non-disclosure" as part of the restrictive covenant section, but that suggestion was rejected. I did not think to suggest including more specific language about non-solicitation, because I understood that was already covered by the existing language of the agreement. I never would have signed this Agreement if I thought the non-solicitation was separate, as the whole point of that provision

14

interpretation.[65]  Based on the weight of the extrinsic evidence introduced to date, I

conclude the parties understood "[a]ny non-competition agreements" to apply

> was to allow me to be free of restrictions if [U.S. Legal] changed my pay and not have to start over somewhere else.  Because I am paid on commission as a salesperson, my compensation is based on my ability to generate revenue. Switching jobs but <u>not</u> being able to solicit former clients effectively means that I would need to start over, something I would necessarily mean that I would make less money working elsewhere.
>
> 15.  Schugart and I entered into the finalized [CAA] in December 2012.  I understood the [CAA] to mean that, if [U.S. Legal] changed my compensation structure, I was free of the restrictions set forth in the Noncompetition Agreement I had signed, and I was free to take my business elsewhere.

Lucido Aff. ¶¶ 13–15.

> Schugart testified as to how he read the CAA:
>
> Q:  Essentially, based on the terms of [the CAA], if you lowered his pay, he's free to work for somebody else and compete against you and solicit; correct?
>
> MR. COLE:  Objection to form.
>
> THE WITNESS:  Yes.  That's what – that's what it says."

Defs.' Ex. 6 at 235 [hereinafter "Schugart Dep."].  *See also* 2012 Stock Option Agr. at 1, §§ 11(a)–(b) (using the term "Noncompetition Agreement" to encompass both noncompetition and nonsolicitation covenants, and "Agreement Not to Compete" to mean Lucido would not "directly or indirectly . . . engage or participate in any manner in a business in competition with the business of the Company," in the same contract).

[65] U.S. Legal tries to discount Schugart's deposition testimony by asserting that, "Mr. Schugart is believed to be suffering from some sort of mental impairment, some sort of cognitive impairment . . . ."  Hr'g Tr. 16–17; D.I. 166 n.22 ("During Defendants' deposition of Shana Holton . . . Holton observed that Schugart's testimony regarding her relationship to U.S. Legal Support was inconsistent, and that Holton understood that Schugart was suffering from a medical condition affecting his memory and cognitive function.." (citing Holton Dep. 15–17).  U.S. Legal also objected to the line of questioning cited above as harassing and calling for a legal opinion.  *Id.* at 21 (citing Schugart Dep. 209–10, 214–16).  Schugart's understanding of a contract he signed is not a legal opinion. And even if I discounted the weight given to Schugart's testimony, Defendants' evidence would still predominate over U.S. Legal's lack of support.

broadly to any restrictive covenants that have the effect of restricting Lucido's right to compete with U.S. Legal, including by soliciting clients. There is no evidence that the CAA parties intended "[a]ny non-competition agreements" to include nondisclosure covenants; rather, there is evidence they intended to exclude nondisclosure covenants.[66]

9. Under the predominating interpretation of the CAA, U.S. Legal has failed to show a reasonable likelihood of success on its claims that Lucido breached operative noncompetition and nonsolicitation covenants in the Stock Option Contracts, the Shareholders' Agreement, and the SPA.

*Plaintiff Has Shown A Reasonable Likelihood Of Success On Its Nondisclosure And Misappropriation Claims.*

10. Of the many agreements Lucido entered into with U.S. Legal, two (the Shareholders' Agreement and the LLC Agreement) contain confidentiality provisions in which Lucido agreed not to misappropriate or disclose U.S. Legal's confidential information.[67] Plaintiff alleges Lucido breached these agreements when

---

[66] Lucido Aff. ¶ 14; Defs.' Ex. 14.

[67] Shareholders' Agr. § 3.01 (agreeing, as Shareholders, that Shareholders "will not (i) disclose to any Person, either directly or indirectly, any Confidential Information, unless and solely to the extent that such Confidential Information is required to be disclosed by law or pursuant to a final judicial order or decree, (ii) use for his or her own account or use, cause, facilitate or allow any third party to use Confidential Information in any way, or (iii) remove any Confidential Information or any copy, summary or compilation of any kind of any Confidential Information from the Company's premises or the premises of the Company's customers, in each case for so long as the Shareholder remains a shareholder of the Company."); LLC Agr. § 6.8 ("Each Unitholder recognizes and acknowledges that it has and may in the future receive certain confidential and proprietary information and

he "appropriate[ed] and us[ed] U.S. Legal Support's trade secret, confidential and/or proprietary business information for the benefit of himself and his new employer."[68] Lucido does not assert the CAA obviated his nondisclosure obligations.[69]

11. Lucido disclosed U.S. Legal's confidential information when he forwarded "significant amounts of confidential information belonging to U.S. Legal Support from his company email to his personal email address."[70] Defendants do not dispute that Lucido forwarded himself information and spreadsheets with U.S. Legal client and billing information.[71]

12. U.S. Legal also alleges that Lucido misappropriated confidential information and trade secrets in violation of the Delaware Uniform Trade Secrets Act ("DUTSA").[72] Under DUTSA, a plaintiff bears the burden to prove: (1) a trade secret exists; (2) "the plaintiff communicated the trade secret;" (3) "such communication was made pursuant to an express or implied understanding that the

---

trade secrets of the LLC, and its Subsidiaries, including confidential information of the LLC, and its Subsidiaries regarding identifiable, specific and discrete business opportunities being pursued by the LLC or its Subsidiaries (the 'Confidential Information')."); *id.* ("[E]ach Unitholder agrees that it will not . . . for as long as such Unitholder holds Units and for five (5) years thereafter . . . take commercial or proprietary advantage of or profit from any Confidential Information or disclose Confidential Information to any Person for any reason or purpose whatsoever . . . .").

[68] Compl. ¶ 66.

[69] *See* Lucido Aff. ¶ 14.

[70] Compl. ¶¶ 56; 73.

[71] *See, e.g.*, Answer ¶¶ 50–51.

[72] Compl. ¶¶ 70–79; 6 *Del. C.* § 2001, *et seq.*

secrecy of the matter would be respected; and" (4) "the trade secret has been used or disclosed improperly to the plaintiff's detriment."[73]

13. To qualify as a protectable trade secret, the confidential information must derive actual or potential "independent economic value by virtue of its not being generally known or readily ascertainable by proper means."[74] Delaware law recognizes customer lists containing important nonpublic information including names, client contacts, the types and volumes of jobs contracted by each customer, which "could take months or years—and significant expense—to accumulate," as trade secrets holding "independent economic value."[75] U.S. Legal's information that Lucido appropriated includes client names, client contacts, billing rates for each job,

---

[73] *Wayman Fire Prot., Inc. v. Premium Fire & Sec., LLC*, 2014 WL 897223, at *13 (Del. Ch. Mar. 5, 2014).

[74] *Great Am. Opportunities, Inc. v. Cherrydale Fundraising, LLC*, 2010 WL 338219, at *17 (Del. Ch. Jan. 29, 2010) (quoting 6 *Del. C.* § 2001(4)) (internal quotation marks omitted).

[75] *See, e.g.*, *id.* at *16, *20; *Nucar Consulting, Inc. v. Doyle*, 2005 WL 820706, at *5 (Del. Ch. Apr. 5, 2005), *aff'd*, 913 A.2d 569 (Del. 2006) ("Trade secrets have actual or potential independent economic value if a competitor cannot produce a comparable product without a similar expenditure of time and money. This requirement of 6 *Del. C.* § 2001(4)(a) highlights the notion of competitive advantage and focuses on whether a plaintiff would lose value and market share if a competitor could enter the market without substantial development expense. The same rationale applies to information that qualifies as a trade secret, such as a customer list that meets the statutory requirements.") (internal footnotes omitted); *but see Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 590 n.103 (Del. Ch. 2010), *aff'd sub nom. ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749 (Del. 2010) (stating that "a compilation of business cards containing contact information" does not qualify as a trade secret (citing *Del. Exp. Shuttle, Inc. v. Older*, 2002 WL 31458243, at *16–19 (Del. Ch. Oct. 23, 2002)).

and case names.[76] U.S. Legal is reasonably likely to demonstrate the information, particularly as aggregated, warrants trade secret protection.

14. Where an employer takes steps to protect the confidentiality of its customer lists, such as including provisions in contracts, its employee handbook, and "letters it sent its employees following termination," it has made reasonable efforts to maintain the secrecy of its customer information.[77] Here, U.S. Legal included nondisclosure provisions in the Shareholders' Agreement,[78] the LLC Agreement,[79] its employee handbook,[80] and the letter to Lucido dated April 3, 2021.[81]

15. U.S. Legal is reasonably likely to show Lucido violated the

---

[76] Compl. ¶¶ 50–51, 56; Compl. Ex. H; Pl.'s Ex. 7; Pl.'s Ex. 8; *see also* Pl.'s Ex. 2; Pl.'s Ex. 3; Pl.'s Ex. 9; Pl.'s Ex. 6; Pl.'s Ex. 42.

[77] *Great Am.*, 2010 WL 338219, at *19.

[78] Shareholders' Agr. § 3.01.

[79] LLC Agr. § 6.8.

[80] Compl. Ex. A at 12 ("During employment at our Company, employees may have access to confidential, secret and proprietary information that is the property of the Company, the Company's customers, or third parties."); *id.* ("Confidential Information is just for our use and not intended for distribution outside the Company. Distribution of Confidential Information within the Company requires both a need to know and a right to know the information requested."); *id.* ("Confidential Information acquired by an employee in the course of their employment with our Company must not be used for the employee's individual benefit. Access to any Confidential Information should not be used for personal benefit or advantage to our Company employees. Every employee is obligated to keep such information confidential and to use it solely in the interest of our Company."); *id.* at 12–13 (listing "Customer lists" as one "Type[] of Confidential Information"); *id.* at 13 ("Employees will not engage in unauthorized use, copying, distribution, or alteration of software or other intellectual property.").

[81] Compl. ¶ 57; Answer ¶ 57.

19

Shareholders' Agreement, LLC Agreement, and employee handbook when he sent and kept U.S. Legal's internal customer data after he signed on with Steno and resigned from U.S. Legal. Lucido, as an actual or potential competitor, is reasonably likely to have held (and to be holding) U.S. Legal's trade secrets to its detriment.[82]

*Plaintiff Has Not Shown A Reasonable Likelihood of Success*
*On Its Claims Against Steno.*

16.     U.S. Legal also seeks a preliminary injunction against Steno based on claims that it tortiously interfered with U.S. Legal's business expectancies and Lucido's contractual obligations, and aided and abetted Lucido's breaches of

---

[82] This conclusion also supports the redundant conclusion that Plaintiff has a reasonable likelihood of success on its claims for breach of fiduciary duty. Compl. ¶¶ 80–89. By virtue of Lucido's access to U.S. Legal's confidential information, U.S. Legal has a reasonable likelihood of success on its breach of fiduciary duty claim as it relates to Lucido's disclosures. *See Mitchell Lane Publ'rs, Inc. v. Rasemas*, 2014 WL 4925150, at *6 (Del. Ch. Sept. 30, 2014) ("[I]f during the course of his employment, such an employee obtains 'secret information relating to his employer's business, he occupies a position of trust and confidence toward it, and must govern his actions accordingly.' The resulting relationship is analogous in most respects to that of a fiduciary." (quoting *Triton Const. Co. v. E. Shore Elec. Servs., Inc.*, 2009 WL 1387115, at *11 (Del. Ch. May 18, 2009), *aff'd*, 988 A.2d 938 (Del. 2010)) (internal footnotes omitted)); *Triton Const.*, 2009 WL 1387115, at *11 ("Whether or not the information rises to the level of a trade secret, an employee has a fiduciary duty to safeguard that information, or at least, not disclose it to a competitor, if the information is secret and the employee has acquired it in the course of his employment." (citing *Brophy v. Cities Serv. Co.*, 70 A.2d 5, 7–8 (Del. Ch. 1949), and *EDIX Media Gp., Inc. v. Mahani*, 2006 WL 3742595, at *5 (Del. Ch. Dec. 12, 2006))).

Lucido is not a fiduciary with respect to binding the Company in contract or otherwise. *Cf. id.* at *10 ("I find that Kirk was not a key managerial employee, and, therefore, owed no fiduciary duties to the Company solely by virtue of his position. Unlike the defendants in *Science Accessories Corp.* [*v. Summagraphics Corp.*, 425 A.2d 957 (Del. 1980)], Kirk did not run a division of the Company or supervise tiers of employees."). U.S. Legal is not reasonably likely to succeed on its claims that Lucido breached such fiduciary duties, or that Steno aided and abetted those alleged breaches.

fiduciary duty. U.S. Legal has not shown a reasonable likelihood of success on those claims.

17. "To prove a claim for tortious interference with prospective business relations, a plaintiff must show: (1) a reasonable probability of a business opportunity; (2) intentional interference by a defendant with that opportunity; (3) proximate causation; and (4) damages."[83] A "mere 'perception' of a prospective business relationship or contract will not 'form the basis of a *bona fide* expectancy.'"[84] A party will fail to establish a likelihood of success if the business opportunity is too speculative.[85] U.S. Legal has not offered any support for its claim that it had a bona fide expectancy to any existing or prospective clients that Lucido solicited or disclosed.[86] Rather, the record to date indicates that even for clients that

---

[83] *Beard Rsch.*, 8 A.3d 573, 607–08 (Del. Ch. 2010) (citing *Triton Const.*, 2009 WL 1387115, at *17).

[84] *Lipson v. Anesthesia Servs., P.A.*, 790 A.2d 1261, 1285 (Del. Super. 2001) (quoting *Dionisi v. DeCampli*, 1995 WL 398536, at *13 (Del. Ch. June 28, 1995)); *DG BF, LLC v. Ray*, 2021 WL 776742, at *19 (Del. Ch. Mar. 1, 2021) ("In order to adequately allege this first element, the claimant must allege a *bona fide* expectancy, something more than a mere hope[,] . . . the innate optimism of the salesman, or a mere perception of a prospective business relationship." (internal quotation marks omitted) (quoting *Carney v. B & B Serv. Co.*, 2019 WL 5579490, at *2 (Del. Ch. Oct. 29, 2019), and *Lipson*, 790 A.2d at 1285)).

[85] *See DG BF*, 2021 WL 776742, at *19 (citing *Preston Hollow Cap. II v. Nuveen LLC*, 2020 WL 1814756, at *12 (Del. Ch. Apr. 9, 2020)).

[86] *See* Schugart Dep. 41 ("Okay. So it's an accurate statement that, just because a firm does business with U.S. Legal, there's no guarantee that they will continue to do business with U.S. Legal in the future? A: That's correct. Q: And that U.S. Legal has to keep providing good service, providing competitive pricing, and continue to fight for each bid into the future, even if they've done business with somebody before? A: That's correct.").

have used a court-reporting service before, each deposition is still the subject of "hand-to-hand combat."[87]

18. A defendant tortiously interferes with a contract under Delaware law when (1) there is a contract, (2) about which defendant knew, and (3) the defendant's intentional act is a significant factor in causing a contract breach (4) without justification (5) injuring plaintiffs.[88] Similarly, U.S. Legal's claim that Steno aided and abetted Lucido's breaches of fiduciary duty requires, among other elements, Steno's knowing participation in Lucido's breach.[89] U.S. Legal fails to show a reasonable likelihood that Steno took an intentional act or knowingly participated in Lucido's disclosures.[90] The record reflects Steno's prophylactic efforts to ask Lucido not to use U.S. Legal's confidential information or trade secrets.[91] While

---

[87] Schugart Dep. 105; Defs.' Ex. 5, Giammanco Dep. 97.

[88] *NAMA Hldgs., LLC v. Related WMC LLC*, 2014 WL 6436647, at *25 (Del. Ch. Nov. 17, 2014).

[89] *In re Rural Metro Corp. S'holders Litig.*, 88 A.3d 54, 80 (Del. Ch. 2014). U.S. Legal's claim that Steno aided and abetted is limited to Lucido's allegedly improper solicitation, for which there is no reasonable likelihood of a predicate breach, as explained above. D.I. 143 at 50, 53.

[90] *See, e.g.*, *Malpiede v. Townson*, 780 A.2d 1075, 1097–98 (Del. 2001) (affirming "that the plaintiffs' aiding and abetting claim fails as a matter of law because the allegations in the complaint do not support an inference that [the alleged aider and abettor] knowingly participated in a fiduciary breach"); *Encore Preakness, Inc. v. Chestnut Health & Rehab. Gp., Inc.*, 2021 WL 3280484, at *3–4 (Del. Super. July 30, 2021) (granting defendants' motion for summary judgment after finding "the record amounts to speculative allegations regarding defendants' conduct" and therefore, plaintiff failed to prove the "'intentional act' element of tortious interference on a summary judgment motion").

[91] Hong TRO Aff. ¶ 5; Hong Aff. ¶ 5; Lucido Dep. 100–02.

22

Lucido was copied on an email from Wilson Elser to Steno,[92] that fact is insufficient to show Steno knowingly participated in Lucido's breaches of his fiduciary duties not to share confidential information.[93] Absent a showing of an intentional act or scienter, U.S. Legal has not demonstrated a reasonable likelihood of success on its claims against Steno.[94]

**Plaintiff Faces A Threat Of Irreparable Harm.**

19. U.S. Legal has made a clear showing of irreparable harm that justifies the extraordinary relief of a preliminary injunction. "Irreparable injury is an indispensable and essential factor in determining whether to grant injunctive relief,"[95] and an injunction "should not be issued in the absence of a clear showing of imminent irreparable harm to the plaintiff."[96] Even assuming the movant has

---

[92] Rivera Dep. at 24–25, 34–35.

[93] *See Neurvana Med., LLC v. Balt USA LLC*, 2020 WL 949917, at \*14 (Del. Ch. Feb. 27, 2020) (allegations that the parties "discussed" the agreement at issue did "not provide a reasonably conceivable basis to conclude that [the defendant] acted with the sort of 'scienter' necessary for a finding of knowing participation in fiduciary breach").

[94] *Lee v. Pincus*, 2014 WL 6066108, at \*13 (Del. Ch. Nov. 14, 2014) (noting that "[k]nowing participation has been described as a 'stringent' standard that 'turn[s] on proof of scienter'") (citing *Allied Cap. Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1039 (Del. Ch. 2006)).

[95] *N.K.S. Distribs., Inc. v. Tigani*, 2010 WL 2367669, at \*4 (Del. Ch. June 7, 2010) (citing *Kingsbridge Cap. Gp. v. Dunkin' Donuts Inc.,* 1989 WL 89449, at \*4 (Del. Ch. Aug. 7, 1989) (denying a motion for a preliminary injunction where plaintiffs did not demonstrate "the *sine qua non* of preliminary injunctive relief: the threat that irreparable harm will befell them . . . unless an injunction issues")).

[96] *In re Cogent, Inc. S'holder Litig.*, 7 A.3d 487, 513 (Del. Ch. 2010) (citing *Baxter Pharm. Prods., Inc. v. ESI Lederle Inc.*, 1999 WL 160148, at \*4 (Del. Ch. Mar. 11, 1999)).

23

made a sufficient showing on the merits,

> the extraordinary remedy of preliminary injunction will issue only where the court is persuaded that the plaintiff is threatened with irreparable harm that will occur before the matter can be determined at trial, and that the harm that plaintiff seeks to avoid outweighs the risk of injury that may befall the defendant in the event the injunction is entered.[97]

"To demonstrate irreparable harm, a plaintiff must present an injury of such a nature that no fair and reasonable redress may be had in a court of law and must show that to refuse the injunction would be a denial of justice."[98]

20. "A 'threat of irreparable injury' typically will exist when a valid restrictive covenant is breached."[99] "Measuring the effects of breaches [of a restrictive covenant] involves a costly process of educated guesswork with no real pretense of accuracy."[100]

21. Further, the Shareholders' Agreement provides, in pertinent part:

---

[97] *Tigani*, 2010 WL 2367669, at *4 (quoting *Kingsbridge Cap.*, 1989 WL 89449, at *4 (internal quotation marks omitted)).

[98] *CBS Corp. v. Nat'l Amusements, Inc.*, 2018 WL 2263385, at *4 (Del. Ch. May 17, 2018) (quoting *Aquila, Inc. v. Quanta Servs., Inc.*, 805 A.2d 196, 208 (Del. Ch. 2002)).

[99] *Mountain W. Series of Lockton Cos., LLC v. Alliant Ins. Servs., Inc.*, 2019 WL 2536104, at *20 (Del. Ch. June 20, 2019) (quoting *Concord Steel. v. Wilm. Steel Processing*, 2008 WL 902406, at *10 (Del. Ch. Apr. 3, 2008)).

[100] *Id.* (quoting *Hough Assocs. v. Hill*, 2007 WL 148751, at *18 (Del. Ch. Jan. 17, 2007)) (internal quotation marks omitted).

> Each party hereto acknowledges that a remedy at law for any breach or attempted breach of any of Articles II and III shall be inadequate and that any breach by any party will cause irreparable harm, injury and damage to the Company, and agrees that each other party hereto shall be entitled to specific performance and injunctive and other equitable relief in case of any such breach or attempted breach and further agrees to waive any requirement for the securing or posting of any bond in connection with the obtaining of any such injunctive or other equitable relief.[101]

"Such stipulations as to irreparable harm have been held to be sufficient to establish that element in order to issue preliminary injunctive relief."[102]

### The Balance Of The Equities Favor The Plaintiff.

22. Finally, the balance of the equities favors U.S. Legal as to the nondisclosure and misappropriation claims. The Court must "balance the plaintiff's need for protection against any harm that can reasonably be expected to befall the defendants if the injunction is granted."[103] The Court

> must be cautious that its injunctive order does not threaten more harm than good. That is, a court in exercising its discretion to issue or deny such a . . . remedy must consider all of the foreseeable consequences of its order and balance them. It cannot, in equity, risk greater harm to defendants, the public or other identified interests, in granting the injunction, than it seeks to prevent.[104]

---

[101] Shareholders' Agr. § 8.06.

[102] *Newell Rubbermaid Inc. v. Storm*, 2014 WL 1266827, at *11 (Del. Ch. Mar. 27, 2014) (citing *Cirrus Hldg. Co. Ltd. v. Cirrus Indus., Inc.*, 794 A.2d 1191, 1209 (Del. Ch. 2001)).

[103] *CBS*, 2018 WL 2263385, at *5 (internal quotation marks omitted) (quoting *Mills Acq. Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1279 (Del. 1989)).

[104] *Id.* (internal quotation marks omitted) (quoting *In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 839 (Del. Ch. 2011)).

23.     U.S. Legal argues the preliminary injunction "will only prohibit Lucido and Steno from engaging in unlawful conduct in which they have no right to engage (*i.e.*, breaching and/or interfering with Lucido's Agreements, . . . and misappropriating U.S. Legal Support's trade secrets, confidential, and/or proprietary information)."[105]

24.     Defendants argue "the information at issue – lists of law firms and lawyers (i.e., the buyers of deposition services), contact information at law firms, case names, and rate or billing information – is either publicly available or readily ascertainable by proper means."[106]  By Defendants' logic, Lucido may use that public information and his own efforts to solicit clients and compete with U.S. Legal as long as he does not use U.S. Legal's confidential information he forwarded himself.

25.     Lucido is enjoined from disclosing, using, or misappropriating U.S. Legal's confidential information, including the information on U.S. Legal's proposed Preliminary Injunction List.

**Bond**

26.     Court of Chancery Rule 65(c) requires an applicant for a preliminary injunction to post a bond in an amount to represent the damages the defendant would

---

[105] D.I. 143 at 58.

[106] D.I. 150 at 43.

26

suffer if the injunction were improvidently granted.[107]  As explained herein, Lucido is enjoined only from using U.S. Legal's confidential and trade secret information, but not from competing with or soliciting from U.S. Legal; and Steno is not enjoined from doing anything.  The $10,000 bond U.S. Legal posted to support its broader temporary restraining order may be replaced with a $5,000 bond.

27.      The Motion for Preliminary Injunction is **GRANTED IN PART**.  The temporary restraining order is hereby **VACATED.**  The preliminary injunction is effective immediately, as U.S. Legal has posted a $10,000 bond; U.S. Legal may replace that bond with a $5,000 bond at its discretion.

*/s/ Morgan T. Zurn*
Vice Chancellor Morgan T. Zurn

---

[107] Ct. Ch. R. 65(c); *Concerned Citizens of Ests. of Fairway Vill. v. Fairway Cap, LLC*, 256 A.3d 737, 743–44 (Del. 2021).